Present: Carrico, C.J., Lacy, Hassell, Keenan, Koontz, and
Lemons, JJ., and Whiting, S.J.

PAUL WARNER POWELL

OPINION BY
v. Record Nos. 002242 & 002243 JUSTICE LAWRENCE L. KOONTZ, JR.
June 8, 2001*

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Herman A. Whisenant, Jr., Judge

In these appeals, we review the capital murder conviction,

related convictions, and sentence of death imposed upon Paul

Warner Powell.[1]

I. THE CRIMES

We will review the evidence in the light most favorable to

the Commonwealth, the party prevailing below. Clagett v.

Commonwealth, 252 Va. 79, 84, 472 S.E.2d 263, 265 (1996), cert.

denied, 519 U.S. 1122 (1997).

Powell was acquainted with Stacey Lynn Reed (Stacey) for

two and a half years prior to the commission of the crimes in

question. Kristie Erin Reed (Kristie), Stacey's younger sister,

_____

* The April 20, 2001 opinion was withdrawn when a petition
for rehearing was granted June 8, 2001.

[1] Powell initially indicated a desire to waive his right to
appeal his convictions and death sentence. By order dated
October 26, 2000, this Court remanded the case to the trial
court for a determination of whether Powell's waiver of his
right to appeal was voluntarily and intelligently made. During
the trial court's hearing on that matter, Powell withdrew his
waiver.

described her sister and Powell as "[f]riends." Powell, who was 20 years old at the time of the murder, had wanted to date Stacey, who was 16 years old, but recognized that she was underage and he "could go to jail for that."

Powell, a self-avowed "racist and white supremacist," was aware that Stacey, who was white, was dating Sean Wilkerson, who is black. Wilkerson had recently moved to another locality, but he and Stacey remained in contact. Stacey was a member of her high school's Junior Reserve Officer's Training Corps and planned to attend a military ball with Wilkerson.

Just before noon on January 29, 1999, Stacey arrived home from school early, having completed her examinations that were being given that day. Powell was waiting for her at her home when she arrived. When Powell learned that Robert Culver, a friend of the girls' mother, would be home shortly for lunch, Powell left and returned at about 12:45 p.m., after Culver had left. When Powell returned, he was armed with a "survival" knife, a "butterfly" knife, a box cutter, and a 9-millimeter pistol.

Stacey was talking to Wilkerson on the telephone. After Stacey ended the telephone conversation, Powell confronted her about her relationship with Wilkerson. He demanded that Stacey

end her relationship with Wilkerson. According to Powell, he and Stacey argued, and the argument grew into a struggle. Powell drew the survival knife from his belt and Stacey "got stuck." Powell denied stabbing Stacey deliberately. The struggle continued briefly until Stacey collapsed on the floor in her sister's bedroom.

Although Powell did not know whether Stacey was still alive, he made no effort to determine her condition or call for medical assistance. Powell "wandered around the house, got some iced tea, had a cigarette." Kristie arrived home from school shortly after 3 p.m. and was met at the door of the home by Powell. Powell told her that Stacey was in her room, but moments later Kristie discovered her sister's body in Kristie's bedroom. She dropped her schoolbooks and began to cry.

Powell ordered Kristie to go to the basement. Kristie, who knew that Powell was usually armed, complied because she "didn't want to die." In the basement, Powell ordered Kristie to remove her clothes and to lie on the floor. Powell then raped Kristie, and she "begg[ed] him not to kill her." Powell later admitted that he knew that Kristie, who was 14 years old at the time of the rape, had been a virgin.

While Powell and Kristie were in the basement, Mark Lewis, a friend of Kristie, came to the house and knocked on the door. When Powell heard the knock, he tied Kristie's legs together and

3

tied her hands behind her back with shoelaces he cut from her athletic shoes.  Powell then dressed and went upstairs.

While Powell was upstairs, Kristie managed to loosen the bonds on her hands and attempted to "scoot across the floor to hide" under the basement steps.  Hearing Powell coming back to the basement, she returned to the position on the floor where he had left her.  Powell then strangled Kristie with a shoelace and she lost consciousness.  While she was unconscious, Powell stabbed Kristie in the abdomen and slit her wrists and throat.

Powell returned upstairs, searching for "anything worth taking."  He fixed another glass of iced tea, which he took with him when he left the home a short time later.  Powell went to a friend's house and then drove with the friend to the District of Columbia to buy crack cocaine.

Kristie regained consciousness sometime after Powell had left her home.  About 4:10 p.m., she heard Culver return home, and she called out his name.  Culver discovered Kristie in the basement, called the 911 emergency response telephone number, and began rendering first aid to her.  He later discovered Stacey's body upstairs.  Shortly thereafter, paramedics arrived. In response to a question from one of them, Kristie identified Powell as her attacker.  Powell was arrested later that day at the home of his friend's girlfriend, where he and the friend had gone after buying drugs.

4

Kristie was transported by helicopter to Inova Fairfax Hospital where she received treatment for her injuries. It was ultimately determined that the wounds to her throat and abdomen each came within one centimeter of severing a major artery which likely would have caused her death.

An autopsy revealed that Stacey had died from a knife wound to the heart. The medical examiner testified that there was a single entrance wound and two exit wounds indicating that the knife had been withdrawn, at least partially, and then reinserted into the heart. One wound path pierced the left ventricle and the other went through both the left and right ventricles, exiting the heart at the back of the right ventricle.

Stacey's body also exhibited a number of bruises on the head, chest, abdomen, back, arms, and legs, abrasions on the face, a stab wound to the back, and a cut and scrapes on the left forearm. The autopsy further revealed that Stacey had been struck on the head with sufficient force to cause bleeding inside her scalp and in the membranes surrounding her brain prior to death. These injuries were not consistent with Stacey merely having fallen during a struggle.

The DNA profile obtained from the blood found on Powell's survival knife was consistent with the DNA profile of Stacey's blood. The DNA profile obtained from sperm fractions from swabs

taken from Kristie's vagina and perianal area was the same profile as that obtained from Powell's drawn blood sample.

While in jail, Powell wrote letters to friends in which he admitted having committed the murder, rape, and attempted murder because of Stacey's relationship with a black man. He further claimed that he had planned to kill Stacey's family and steal the family's truck. Powell also wrote to a female friend and asked her to "get one of [her] guy friends . . . to go to a pay phone and call Kristie and tell her [that] she better tell the cops she lied to them and tell her [that] she better not testify against me or she's gonna die."

Powell told another inmate that he had become angry with Stacey when she refused to have sex with him after talking to Wilkerson. Powell told the inmate that he stabbed Stacey twice and that when he attempted to cut Kristie's throat, his knife was too dull, "[s]o he started stepping on her throat trying to stomp her throat." To another inmate, Powell described Stacey's killing as a "human sacrifice" and expressed satisfaction in having raped a virgin.

## II.  PROCEEDINGS

### A. Pre-Trial

On May 3, 1999, Powell was indicted for the capital murder of Stacey in the commission of a robbery and/or attempted robbery, Code § 18.2-31(4), attempted capital murder of Kristie

6

in the commission of rape, Code § 18.2-31(5), abduction of Kristie with intent to defile, Code § 18.2-48(ii), and the rape of Kristie, Code § 18.2-61.[2]  Powell filed a motion to have the capital murder and death penalty statutes declared unconstitutional and to strike the capital murder and attempted capital murder indictments.  In a supporting memorandum, Powell raised several challenges to the constitutionality of the statutes, which he reasserts in these appeals and which will be discussed later in this opinion.  The trial court denied the motion.

On September 14, 1999, the Commonwealth filed a motion pursuant to Code § 19.2-231 to amend the indictment for the capital murder of Stacey to also charge capital murder "during the commission of or subsequent to rape and/or attempted rape and/or sodomy and/or attempted sodomy."  Powell objected to the proposed amendment, asserting that it would change the nature or character of the offense charged.  The trial court permitted the amendment to the indictment.

---

[2] Powell was also indicted for grand larceny in violation of Code § 18.2-95 in connection with the theft of a weapon in an unrelated incident, was convicted of that crime, and sentenced to two years imprisonment.  Powell does not directly challenge that conviction in these appeals.  Powell was also indicted for robbery and attempted robbery in violation of Code § 18.2-58 and three counts of use of a firearm in violation of Code § 18.2-53.1.  He was acquitted of these crimes.

On May 5, 1999, Powell made a motion for the appointment of a mental health expert to assist in his defense pursuant to Code § 19.2-264.3:1.  The trial court granted this motion on May 14, 1999.  Powell subsequently advised the Commonwealth that he intended to use the expert to provide psychiatric evidence in mitigation during the sentencing phase of the trial, if necessary.

On January 5, 2000, the Commonwealth made a motion to have Powell examined by its mental health expert pursuant to Code § 19.2-264.3:1(F)(1).  By order entered on February 24, 2000, the trial court appointed Dr. Stanton E. Samenow, a clinical psychologist, to evaluate Powell on behalf of the Commonwealth. The order noted Powell's intention to present psychiatric evidence in mitigation and directed Dr. Samenow to evaluate Powell's sanity at the time of the offense pursuant to Code §§ 19.2-168.1 and 19.2-169.5.

On March 8, 2000, Dr. Samenow met with Powell.  After answering the doctor's initial general questions, Powell indicated that he did not "feel like talking no more."  Powell then stated that he had decided not to cooperate with the examination and that he had only come to the interview because he "didn't know who was here."

The Commonwealth filed a motion to exclude Powell's psychiatric evidence in mitigation.  On March 24, 2000, the

8

trial court entered an order directing Powell to cooperate with Dr. Samenow, noting specifically that failure to do so would result in the exclusion of Powell's expert evidence. Powell continued to refuse to cooperate with Dr. Samenow. The trial court deferred ruling on the Commonwealth's motion to exclude Powell's expert evidence, entering an order directing Powell's counsel to refrain from mentioning such evidence at trial until its admissibility was determined.

## B. Voir Dire

Trial commenced with jury selection on May 1, 2000. The voir dire of potential jurors was conducted in four panels. The trial court questioned jurors generally concerning possible relationships with the victims, Powell, the trial attorneys, and any interest, knowledge of, or opinions about the case. The trial court also questioned the jurors about their ability to be fair and impartial and to render a verdict and sentence based solely on the evidence presented at trial and the trial court's instructions. The jurors of each panel indicated that they would be able to consider the evidence, including evidence in mitigation of a death sentence, fairly and impartially, and to follow the trial court's instructions.

Powell's counsel questioned the first two panels of potential jurors concerning their opinion as to specific types of evidence in mitigation, including Powell's age, his remorse,

his "emotional problems from a relatively young age," and his lack of a "significant history of prior criminal activity." Three jurors in the second panel, Tilley, Neal, and Henderson, each stated that they did not believe Powell's age or a showing of remorse would be factors weighing in favor of a sentence of life rather than death.[3]  As Powell's counsel continued this line of questioning by addressing Powell's "learning disabilities and . . . problems in school," the Commonwealth objected, asserting that these matters were not permissible evidence in mitigation.

Addressing the Commonwealth's objection, the trial court expressed concern about the entire line of questioning regarding the jurors' views on specific mitigating evidence.  Noting that all the jurors had indicated an ability to consider such evidence, the trial court observed that the questions of Powell's counsel were "vague" and "ambiguous" and that the jurors were "confused" by them.  The trial court then ruled that these questions "exceeded the scope that the statute allows with voir dire," and that Powell would thereafter be limited to asking jurors whether they would be able to consider mitigating evidence and follow the trial court's instructions on considering such evidence in sentencing.  When Powell's counsel

---

[3] Two of the jurors, apparently misunderstanding counsel's question, first indicated that Powell's age was not a factor they would consider relevant to his guilt or innocence.

subsequently attempted to ask the jurors on the remaining panels whether they had opinions about the value of specific mitigating evidence, the trial court sustained the Commonwealth's renewed objections.

Powell moved to strike jurors Tilley, Neal, and Henderson for cause, asserting that they had indicated an unwillingness to consider proper mitigating evidence. The trial court overruled the motion, stating that all these jurors indicated they had the ability to consider all the evidence and follow the trial court's instructions. Powell subsequently objected to the seating of the selected jury panel, again asserting that he should have been permitted to inquire into the jurors' opinions about the value of specific mitigating evidence. The trial court overruled the objection.

In the course of questioning by both the Commonwealth and Powell's counsel, prospective juror O'Dell repeatedly expressed her concern that she would be required to make a decision on the imposition of the death penalty and "would find it very difficult" to do so. She further agreed that she had not decided firmly what her opinion of the death penalty was and would have to reach that decision "sometime between now and the end of this case."

The Commonwealth moved to strike O'Dell on the ground that she was uncertain of her views regarding the death penalty and

whether she would be able to follow the trial court's instructions regarding sentencing. Powell countered that O'Dell had not affirmatively stated that she would not be able to impose a sentence of death. The trial court sustained the Commonwealth's motion and removed O'Dell from the venire for cause.

### C. Guilt-Determination Phase

During the guilt-determination phase of the bifurcated trial, evidence in accord with the facts of the crimes recited above was received from the Commonwealth's witnesses. During the testimony of Dr. Frances Patricia Field, Assistant Chief Medical Examiner for the Northern Virginia District Medical Examiner's Office, the Commonwealth introduced the autopsy report regarding Stacey Reed. Included in the report was a narrative description of the circumstances surrounding Stacey's death made during the first examination of the body by a local medical examiner. That narrative included a notation that "neighbors saw [Stacey with] suspect approx. noon. Approx. 3:30-4:00 p.m. suspect seen [with] sister by neighbors."[4]

---

[4] There is some dispute as to whether the shorthand notation in the report is intended to be read as "with," as rendered here, or as "and." Regardless of which word was intended, the substance of the report is not materially altered.

After the Commonwealth concluded its case-in-chief, Powell's counsel made a motion for a mistrial on the ground that the Commonwealth had failed to provide as part of its response to discovery the portion of the autopsy report that indicated neighbors had seen a "suspect" with each of the girls. Powell's counsel contended that had he been in possession of this information, he would have conducted his cross-examination of Kristie and Lewis differently. Powell's counsel further contended that disclosure of the statement "would have opened up avenues of investigation, which might have led to further exculpatory information."

The Commonwealth responded that the exculpatory value of the narrative notation in the medical examiner's report was speculative at best. The Commonwealth noted that this narrative was created before the investigation of the crimes was complete and that the information in this particular section of the report did not reflect the personal knowledge of the medical examiner. During subsequent investigations, the police were unable to locate any witnesses who had seen Powell or anyone else with the sisters on that afternoon. The trial court overruled the motion for a mistrial, ruling that there was nothing exculpatory in the preliminary autopsy report and that it was mere speculation that the information in the report would have led to some exculpatory evidence. The trial court further

noted that the objection to the report and the motion for mistrial were untimely, since no objection to the report had been raised at the time it was received into evidence.

Powell then made a motion to strike each of the charges against him. Relevant to the issues raised in these appeals, Powell argued that there was insufficient evidence to support the charge of abduction of Kristie because the restraint used did not exceed that necessary to accomplish the rape and attempted capital murder of her. With respect to the charge of capital murder of Stacey during the commission of rape or attempted rape, Powell contended that the evidence showed that the rape of Kristie occurred after the murder of Stacey. Powell argued that because the indictment had used the phrase "during the commission of or subsequent to rape" the rape must proceed or be concurrent with the murder in order to provide the gradation crime necessary for enhancing first degree murder to capital murder. The Commonwealth stipulated that there was no evidence of sodomy or attempted sodomy. The trial court denied Powell's motion to strike.

Powell did not present any evidence and renewed his motion to strike, which the trial court again denied. The guilt-determination phase of the trial proceeded to jury instructions and closing arguments.

14

Relevant to the issues raised in these appeals, Powell objected to the Commonwealth's proffered instruction 5 which defined the phrase "during the commission of" rape as meaning that the rape occurred "before, during or after" the murder. Powell again asserted that the amended indictment charged that the murder occurred "during the commission of or subsequent to rape" and, thus, "the phrase they are dealing with is during, not before and not after."  The Commonwealth responded that the instruction was a correct statement of law.  The trial court granted the instruction.

Powell also objected to the Commonwealth's proffered instruction 7, which, in part, stated that "it is immaterial whether the rape [of another victim] occurred before or after the death of the murder victim."  Powell contended that a correct statement of law would include the further instruction that the rape and murder were "so closely related in time, place, and causal connection as to make the killing part of the same criminal enterprise as the" rape.  However, Powell did not request that the trial court amend the Commonwealth's proffered instruction or proffer an instruction of his own on this point of law.  The Commonwealth contended that its instruction was a correct statement of law under Spencer v. Commonwealth, 238 Va. 275, 285, 384 S.E.2d 775, 780 (1989), cert. denied, 493 U.S.

15

1036 (1990). The trial court overruled the objection and granted the instruction.

In addition, Powell objected to the Commonwealth's proffered instruction 10, which defined " '[w]illful, deliberate, and premeditated' [as meaning] a specific intent to kill, adopted at some time before the killing, but which need not exist for any particular length of time." Powell contended that the instruction was "too concise a statement of the law." Powell proffered instruction U as an alternative:

> For the killing to be willful, deliberate, and premeditated, it is necessary that it [should] have been done on purpose, and not by accident, or without design; that the accused must have reflected with a view to determine whether he would kill or not; and that he must have determined to kill as the result of that reflection before he does the act—that is to say, the killing must be a premeditated killing upon consideration. The design to kill need not have existed for any particular length of time; it may [have] been formed at the moment of the commission of the act.

Powell contended that his instruction, which was drawn from language in Pannill v. Commonwealth, 185 Va. 244, 255, 38 S.E.2d 457, 463 (1946), was a more accurate statement of law. The Commonwealth responded that instruction 10, a "Model [Jury] Instruction," was "a more modern and concise statement of the principles of Pannill," and asserted that the purpose of jury instructions "is to make the law as clear and understandable as

16

possible" for the jurors.  The trial court overruled Powell's objection, granted instruction 10, and refused instruction U.

During closing argument, the Commonwealth noted Powell had subsequently told others that he intended to steal property from the home and that he was looking for money to steal immediately after stabbing Stacey.  Noting that Stacey was probably still alive at that time, the Commonwealth continued, "it's as likely as any scenario — but we'll never know because he hasn't told us."

Powell objected to this statement as soon as it was made, but the trial court directed that the objection would not be heard until closing argument had concluded.  Once the Commonwealth completed its argument, Powell renewed his objection and moved for a mistrial, contending that the Commonwealth had made an improper reference to Powell's failure to testify.  The Commonwealth represented that the reference was to Powell's comments on the videotaped statement in which he denied having intended to rob Stacey.  The trial court accepted this explanation, denied the motion for mistrial, and subsequently instructed the jury that Powell had an "absolute right" not to testify and that it "shall not consider his exercise of [that] right as evidence and shall not draw from it any inference whatsoever."

17

During its deliberations, the jury sent a question to the trial court seeking clarification whether the rape of Kristie could satisfy the gradation crime requirement for the capital murder of Stacey. The trial court initially indicated that it would respond in the negative because the rape was "too remote in time" from the murder. The Commonwealth argued that there was sufficient evidence from which the jury could find that Stacey's murder facilitated the subsequent rape of Kristie and, thus, that the rape was part of the same criminal enterprise as the murder.

Relying on Coleman v. Commonwealth, 226 Va. 31, 307 S.E.2d 864 (1983), cert. denied, 465 U.S. 1109 (1984), and Spencer, 238 Va. at 283, 384 S.E.2d at 779, the Commonwealth further argued that the jury need only find that Powell had the intent to rape Kristie when he killed Stacey. Powell contended that the jury's confusion stemmed from the instructions he had previously objected to concerning the definition of the murder occurring "during" the commission of one or more of the gradation crimes. Powell further asserted that the evidence showed that "a significant period of time elapsed" between the murder and the rape.

The trial court gave the following response to the jury's question:

Yes. Murder in [t]he [c]ommission of a rape is a killing which takes place before, during or after the rape and is so closely related thereto in time, place, and causal connection as to make the killing part of the same criminal enterprise as the rape.

After the trial court noted Powell's objection to the response to the jury, Powell's counsel asked "to be permitted to argue this new instruction." The trial court denied this request.

The jury returned verdicts convicting Powell of capital murder, attempted capital murder, rape, and abduction. Powell requested that the trial court poll the jury concerning unanimity of the capital murder conviction and also whether the gradation crime relied upon was robbery or rape. The jury responded that the conviction for capital murder was unanimous and that the gradation crime had been rape. Powell then requested "that the jury be polled . . . as to whether they found the rape was committed before, during or after the act of murder." The trial court denied this request.

### D. Penalty-Determination Phase

Before beginning the presentation of its evidence with regard to imposition of the death penalty, the Commonwealth renewed its motion to exclude testimony from Powell's mental health expert on the ground that Powell had refused to cooperate with the Commonwealth's mental health expert. Dr. Samenow was called as a witness out of the presence of the jury to give

19

evidence in this regard. During his testimony, Dr. Samenow stated that during his second effort to interview Powell, a jail officer told him that Powell had refused to meet or speak with Dr. Samenow. Powell objected to this evidence as "[h]earsay." The trial court allowed the testimony.

Responding to the Commonwealth's motion, Powell's counsel asserted that in refusing to cooperate with Dr. Samenow, Powell was properly exercising his Fifth Amendment right against self-incrimination. Counsel further asserted that the trial court's order had limited Dr. Samenow's evaluation to a determination of Powell's sanity at the time of the offense. Therefore, because Powell's expert evidence in mitigation of the death sentence would not relate to Powell's guilt, it would be an abuse of discretion to refuse to allow that evidence for failure to comply with that order. The trial court ruled that Powell's expert witness would not be allowed to testify.

When the Commonwealth attempted to elicit testimony from a police officer concerning admissions made by Powell that he had committed a large number of residential burglaries, Powell objected on the ground that the Commonwealth's intention to refer to these crimes had not been disclosed under Powell's discovery motion. The Commonwealth responded that while the specific acts had not been listed in a separate notice, the statements in which Powell made the admissions had been provided

20

to the defense.  The trial court permitted the evidence on the ground that the defense had actual notice of the Commonwealth's intent regarding this evidence from the statements provided.

Additional evidence presented by the Commonwealth relevant to sentencing included Powell's juvenile record, his admission that he had tortured and killed cats when he was younger, and evidence that he had threatened a jail officer and a prosecutor. At the conclusion of the Commonwealth's evidence, Powell made a motion to strike the evidence regarding the aggravating factor of future dangerousness and that of the vileness of the crime. The trial court denied the motion.

Powell's counsel made a motion for a competency evaluation of Powell on the ground that Powell had directed them to present no evidence in mitigation.  Counsel proffered the evidence they would have presented and indicated that Powell's refusal to permit this evidence to be presented showed that he lacked the capacity to assist them in conducting his defense.  Counsel conceded, however, that they had talked extensively with Powell about the matter, that Powell had stated his reasons for not wishing to have any evidence in mitigation placed before the jury, and that "he has thought about this and . . . understands the consequences and knows what he's doing."  Counsel declined to state what Powell's reasons were, but nonetheless asserted that Powell's decision was the result of a "mental illness"

which caused him to act in a manner contrary to his own best interests.

The Commonwealth responded that there was no probable cause to find that Powell lacked the capacity to understand the proceedings and knowingly and intelligently direct his counsel not to present mitigating evidence if that was his choice. The trial court ruled that Powell's refusal to follow his counsel's advice did not indicate a lack of capacity in light of the circumstances and denied the motion for a competency evaluation. Powell presented no evidence relevant to sentencing and renewed his motion to strike, which the trial court again denied.

The Commonwealth proffered instruction 28 on sentencing. The instruction advised the jury that it could impose a sentence of death, life imprisonment, or life imprisonment and a fine of up to $100,000 if it found either or both the aggravating factors to be present, and a sentence of life imprisonment or life imprisonment and a fine of up to $100,000 if the jury found neither aggravating factor to be present. Powell objected to this instruction, contending that it failed to "clearly advise the jury that even if they make one or both of these findings of aggravating factors that they are still entitled if they feel it's justified to sentence the Defendant to not death but imprisonment for life." Powell proffered two instructions, Z and AA: the first stating the sentencing alternatives and the

22

second stating the option to impose life imprisonment even where the jury found one or both of the aggravating factors to be present. The trial court overruled Powell's objection, finding that the Commonwealth's instruction was an accurate statement of the law and that Powell's instructions would unnecessarily duplicate instruction 28.

The Commonwealth proffered five penalty-phase verdict forms: one for the imposition of a sentence of death based upon a finding of both aggravating factors, one for the imposition of a sentence of death based upon a finding of future dangerousness only, one for the imposition of a sentence of death based upon a finding of vileness, one for the imposition of a life sentence, and one for the imposition of a life sentence and a fine of up to $100,000. These last two verdict forms made no mention of the presence or absence of aggravating factors. Each of the verdict forms directed the jury to consider all the evidence including evidence in mitigation.

Powell objected that the forms permitting a sentence of life imprisonment or life imprisonment and a fine were incomplete. Powell specifically argued that the jury "need[s] forms that indicate they can find one or both aggravating factors and still impose a punishment [of] imprisonment for life or a [punishment] of imprisonment for life and a fine of [up to] $100,000." The trial court ruled that the Commonwealth's forms

23

adequately provided the jury with a means to impose the
sentences outlined in the sentencing instruction.[5]

The jury was instructed and heard argument regarding
sentencing from Powell and the Commonwealth. Following
deliberations, the jury rendered a verdict for a sentence of
death for the capital murder based upon the vileness aggravating
factor only. The jury was polled and was unanimous as to its
verdict. On the non-capital offenses, the jury fixed Powell's
punishment at life imprisonment and a fine of $100,000 for
attempted capital murder, life imprisonment and a fine of
$100,000 for abduction with intent to defile, and life
imprisonment for rape.

### E. Sentencing

Following the preparation of a pre-sentence report, the
trial court held a sentencing hearing on August 10, 2000.
Relevant to the issues raised in these appeals, at that hearing
Powell called Jennifer M. Day, the foreperson of the jury in his
trial, as a witness. Day testified that the trial court's
response to the jury's inquiry during the guilt-determination
phase had been "the determining factor" for her regarding

---

[5] Powell further asserted that the verdict forms were
improper because the description of the offense did not
precisely track the language of the indictment. Powell does not
reassert this issue on appeal.

24

whether Powell was guilty of capital murder. She further testified that she had not understood that a sentence of life imprisonment was an option even if the jury found that at least one of the aggravating factors was present. She testified that she would have voted to impose a life sentence had the jury been provided with a verdict form that specifically provided for a life sentence even with the finding of vileness.

On cross-examination, Day testified that she was a legal secretary and had "volunteered" to interpret the instructions provided to the jury for the other jurors. She further testified that she had read instruction 28 and understood that the jury was permitted to impose a life sentence even if it found one or both of the aggravating factors to be present. Day admitted that following the trial she began to feel "guilty" about the verdict and death sentence and was concerned that Powell's attorneys had not provided him with an adequate defense.

Day also testified that following the trial she began having regular contact with Powell through telephone calls, correspondence, and visits to the jail. Day, who is married, sent Powell material copied from the Internet including information on conjugal visits, sexually explicit jokes, and a "love horoscope." She denied wanting to have a physical relationship with Powell, indicating that she had told Powell

25

they might be able to have contact visits only because she hoped this would give him a reason to live. Day also sent money to Powell, offered to assist him in finding new legal counsel, and specifically told Powell that she would do what she could "to see that he did not get the death penalty."

Powell asserted that there was good cause to set aside the jury's sentence of death based upon Day's testimony. The trial court rejected Powell's assertion, finding that the jury instructions and sentencing forms were adequate and that Day's credibility was tainted by her relationship with Powell and her desire to help him avoid the death penalty. By order entered September 6, 2000, the trial court confirmed the jury's verdicts and sentences.

We consolidated the automatic review of Powell's death sentence with his appeal of the capital murder conviction. Code § 17.1-313(F). Powell's appeal of his non-capital convictions was certified from the Court of Appeals, Code § 17.1-409, consolidated with his capital murder appeal, and the consolidated appeals were given priority on our docket.

III. DISCUSSION

Powell raises twenty-five assignments of error in these consolidated appeals regarding his capital murder conviction and his non-capital convictions, and we have carefully considered each of them. However, because we are of opinion that several

26

issues raised are dispositive of, or necessary to, our ultimate

holding that Powell's capital murder conviction will be reversed

and his non-capital convictions will be affirmed, we will not

address all of Powell's assignments of error.[6]  In addition, we

take the opportunity provided by this case to address several

other issues that are critical to the proper prosecution of

capital murder cases and will be instructive to such future

cases.

A. Constitutional Challenges to Capital Punishment Statutes

Powell assigns error to the trial court's denial of his

motion to have the Virginia death penalty statute and the

statutory scheme under which capital murder trials are conducted

and death sentences are reviewed on appeal declared

unconstitutional.  To the extent that this assignment of error

remains pertinent to Powell's conviction of attempted capital

---

[6] The issues raised that we need not address are: the
failure of the trial court to strike the Commonwealth's evidence
as to vileness; the admission of hearsay evidence concerning
Powell's failure to cooperate with the Commonwealth's mental
health expert; the granting of the Commonwealth's motion to
exclude the testimony of Powell's mental health expert; the
admission of evidence of Powell's unadjudicated conduct; the
trial court's denial of Powell's motion for a competency
evaluation based upon his desire not to have his counsel present
mitigating evidence; the trial court's failure to give Powell's
proffered instructions on sentencing; and the trial court's
failure to set aside the death sentence.  Similarly, because we
will not be required to conduct the review of the death sentence
under Code § 17.1-313(C), the assignments of error corresponding

murder, we have addressed and rejected in prior capital murder cases the specific arguments raised in it, and we find no reason to modify our previously expressed views on these issues:

(1) Virginia's two statutory aggravating factors of "future dangerousness" and "vileness" are not unconstitutionally vague. Beck v. Commonwealth, 253 Va. 373, 387, 484 S.E.2d 898, 907, cert. denied, 522 U.S. 1018 (1997) ("vileness"); Clagett, 252 Va. at 86, 472 S.E.2d at 267 ("future dangerousness").

(2) Virginia's penalty-determination phase instructions adequately inform the jury regarding the concept of mitigation. Swann v. Commonwealth, 247 Va. 222, 228, 441 S.E.2d 195, 200, cert. denied, 513 U.S. 889 (1994).

## B. Amendment of Indictment

Powell assigns error to the trial court's overruling his objection to the Commonwealth's motion to amend the indictment charging him with capital murder of Stacey in the commission of a robbery and/or attempted robbery to include an alternative and additional count of capital murder "during the commission of or subsequent to rape and/or attempted rape and/or sodomy and/or attempted sodomy." Powell contends that by this amendment, the Commonwealth impermissibly expanded the nature and character of the charges against him. The Commonwealth responds that the

to the issues to be considered in the statutory review are also

28

amendment of the indictment was permissible under Code § 19.2-231 because it did not change the nature of the offense charged. The Commonwealth contends that the offense charged continued to be capital murder and that the amendment merely placed Powell on notice that the Commonwealth would seek to use the offense of rape as a gradation crime to prove capital murder.

Code § 19.2-231 provides:

> If there be any defect in form in any indictment, presentment or information, or if there shall appear to be any variance between the allegations therein and the evidence offered in proof thereof, the court may permit amendment of such indictment, presentment or information, at any time before the jury returns a verdict or the court finds the accused guilty or not guilty, provided the amendment does not change the nature or character of the offense charged. After any such amendment the accused shall be arraigned on the indictment, presentment or information as amended, and shall be allowed to plead anew thereto, if he so desires, and the trial shall proceed as if no amendment had been made; but if the court finds that such amendment operates as a surprise to the accused, he shall be entitled, upon request, to a continuance of the case for a reasonable time.

The statute is remedial in nature and is to be liberally construed in order to achieve the laudable purpose of avoiding further unnecessary delay in the criminal justice process by allowing amendment, rather than requiring reindictment by a grand jury. Sullivan v. Commonwealth, 157 Va. 867, 876-77, 161 S.E. 297, 300 (1931). The amendment, when allowed, must provide

moot.

29

that the substantial rights of the accused are protected by informing him of the nature and character of the accusations. Id. As a rule, amendments to correct a variance between the allegation of the indictment and the proof occur after the Commonwealth has presented a portion or all of its case, placing the trial court in a position to judge whether that proof would be adequate to support the return of the amended indictment. See, e.g., Thomas v. Commonwealth, 256 Va. 38, 42, 501 S.E.2d 391, 393 (1998)(amendment after trial but prior to return of verdict).

Here, there is no allegation by the Commonwealth that the amendment was intended to correct a defect in form. Indeed, there was no such defect. Accordingly, the issue we must determine is whether the pre-trial amendment of an indictment charging one theory of capital murder to include an alternative and additional theory of capital murder constitutes an amendment contemplated by the provisions of Code § 19.2-231 to correct a variance between the allegation of the original indictment and the proof the Commonwealth expects to adduce at the subsequent trial. For the following reasons, we hold that the particular amendment made to the indictment in this case was not authorized by Code § 19.2-231.

Under the original indictment returned by the grand jury in this case, Powell was charged with a single count of capital

30

murder in which the gradation crime was the commission or attempted commission of robbery, a violation of Code § 18.2-31(4). In amending the indictment, the Commonwealth used the term "and/or" to charge two new gradation crimes, the commission or attempted commission of rape and the commission or attempted commission of sodomy, either of which would constitute a violation of Code § 18.2-31(5). In doing so, the Commonwealth did not simply correct a variance between the original allegation and the proof it expected to adduce at trial. Rather, by use of the term "and/or," the Commonwealth expanded the indictment to include a new and additional charge of capital murder. See Bailey v. Commonwealth, 259 Va. 723, 747, 529 S.E.2d 570, 584, cert. denied, ___ U.S. ___, 121 S.Ct. 488 (2000). As a result, under the amended indictment Powell could have been convicted and sentenced on one count of capital murder under Code § 18.2-31(4) and another count of capital murder under Code § 18.2-31(5).[7] Id.

Although the same grand jury also indicted Powell for the rape of Kristie, it was never called upon to consider that

_____

[7] It is irrelevant that the Commonwealth did not expressly seek separate convictions for the two counts of capital murder or that Powell was acquitted of capital murder in the commission of robbery and, thus, was not actually subject to an increased punishment. We are not here concerned with the outcome of the trial on the amended indictment, but whether the amendment of the indictment was proper.

31

offense as the gradation crime for the capital murder of Stacey. Similarly, nothing in the record suggests that the grand jury heard any evidence with respect to the gradation crime of sodomy. The record as a whole is devoid of any evidence that Powell attempted to rape or sodomize Stacey, despite Powell's subsequent claim that he attempted to initiate consensual sexual relations with her. Thus, the amendment to the indictment was premised upon allegations not previously considered by the grand jury. It is "the province of the grand jury [under Code § 19.2-191] to ascertain from the evidence adduced whether or not" the evidence will sustain the charge brought. Evans v. Commonwealth, 183 Va. 775, 780, 335 S.E.2d 636, 638 (1945).

Accordingly, despite the liberal construction afforded to promote the remedial purpose of Code § 19.2-231, and because the amended indictment materially changed the nature of the offense originally charged, we hold that the trial court erred in permitting the Commonwealth to amend the indictment for capital murder. Thus, Powell's conviction for capital murder under the amended indictment cannot stand.

Although our determination that the amendment of the indictment was error and will necessitate reversal of Powell's conviction for capital murder, we must nonetheless consider other issues that may have relevance to any trial on remand for the murder offense and the issues raised by the appeal of

32

Powell's convictions for the non-capital offenses.  We turn now to address those issues in the order in which they arose at trial.

### C. Jury Selection

Powell assigns error to the trial court's striking for cause of juror O'Dell and failing to strike for cause jurors Tilley, Neal, and Henderson.  Powell also assigns error to the trial court's limiting of his questions during voir dire and to the trial court's seating of the jury panel following the limiting of his voir dire.  To the extent that the selection of the jury is an issue impacting Powell's non-capital convictions, we will address the issues raised in these assignments of error.

Powell contends that juror O'Dell should have been retained in the venire because she did not expressly state that she would be unable to impose the death penalty.  Contrary to Powell's contention, however, the record reveals that O'Dell did not merely express reservations about the death penalty.  Rather, she affirmatively stated that she had not made up her mind as to whether she would be able to follow the trial court's instructions and consider all possible sentencing options including a sentence of death.  She indicated that she would not reach a decision on whether she would be able to follow the trial court's instructions and consider imposing a sentence of death until sometime later in the trial.  Under these

circumstances, we cannot say that the trial court abused its discretion in striking O'Dell from the venire. Barnabei v. Commonwealth, 252 Va. 161, 173, 477 S.E.2d 270, 277 (1996), cert. denied, 520 U.S. 1224 (1997).

Powell contends that jurors Tilley, Neal, and Henderson should have been removed from the venire because each indicated, in response to questions asked by his counsel, that they would not consider evidence in mitigation if called upon to consider whether to impose a sentence of death. Powell further contends that the trial court erred when it subsequently prohibited him from making similar inquiries to the remaining members of the venire. Powell's contentions misrepresent the nature of the questions and the responses given by the three prospective jurors.

In conducting our review, we consider the jurors' entire voir dire, not merely isolated statements. Clagett, 252 Va. at 90, 472 S.E.2d at 269; Mackall v. Commonwealth, 236 Va. 240, 252, 372 S.E.2d 759, 767 (1988), cert. denied, 492 U.S. 925 (1989). Each juror had previously indicated in response to questions from the trial court and counsel that he or she would be able to follow the trial court's instructions and consider all the evidence, including evidence in mitigation, when considering whether to impose a death sentence. The nature of the questions Powell's counsel asked and the responses of the

34

three jurors did not relate to whether the jurors would consider evidence in mitigation, but whether specific mitigating factors "[w]ould . . . prevent [the juror] from imposing the death penalty." Such questions are improper in voir dire because they are not relevant to a determination of whether a juror has a particular bias or prejudice, but instead attempt to elicit the juror's views on specific types of evidence. LeVasseur v. Commonwealth, 225 Va. 564, 580-81, 304 S.E.2d 644, 653 (1983), cert. denied, 464 U.S. 1063 (1984). "The court must afford a party a full and fair opportunity to ascertain whether prospective jurors 'stand indifferent in the cause,' but the trial judge retains the discretion to determine when the parties have had sufficient opportunity to do so." Id. at 581, 304 S.E.2d at 653.

In summary, there is no merit to Powell's challenges to the selection of the jury in this case. We hold that the trial court did not abuse its discretion in striking O'Dell, in refusing to strike Tilley, Neal, and Henderson, in limiting the voir dire of the remaining members of the venire, and in seating the jury panel.

### D. Discovery Violation

Powell assigns error to the trial court's failure to grant his motion for mistrial on the ground that the Commonwealth failed to disclose the contents of the preliminary autopsy

35

report under Brady v. Maryland, 373 U.S. 83, 87 (1963). We hold that the trial court properly ruled that Powell's motion for mistrial was untimely. The trial court does not abuse its discretion in denying a new objection raised to previously admitted evidence after the Commonwealth has rested its case.[8] Lovitt v. Commonwealth, 260 Va. 497, 512, 537 S.E.2d 866, 876 (2000).

### E. Guilt-Determination Phase
### Jury Instructions and Jury Inquiry

Powell assigns error to the trial court's granting of Commonwealth's instructions 5, 7, and 10 and in refusing his instruction U.[9] Powell further assigns error to the answer given by the trial court in response to the jury inquiry for clarification whether the rape of Kristie could serve as the gradation crime for the capital murder of Stacey.

The thrust of all these objections is Powell's contention that under the wording of the amended indictment, the

---

[8] In light of our holding that the trial court was correct in overruling the motion as untimely, we need not address the trial court's further determination that the motion was without merit.

[9] Powell also assigned error to the trial court's granting of instructions 4 and 6 and refusing his instruction Y. On brief, Powell concedes that his objections concerning instructions 4 and Y are mooted by his acquittal on the charge of capital murder in the commission of robbery. Similarly, any error in granting instruction 6, which also related only to the charge of capital murder in the commission of robbery, is moot.

Commonwealth was limited to proving that the killing of Stacey occurred "during the commission of or subsequent to" the rape of Kristie, and not, as the trial court instructed the jury, that the killing occurred "<u>before</u>, during, or after" that rape. (Emphasis added). The Commonwealth concedes that the language of the amended indictment fails to track the current wording of Code § 18.2-31(5), which provides for a premeditated killing "<u>in</u> the commission of, or subsequent to, rape." (Emphasis added). It contends, however, that the phrase "during the commission of, or subsequent to" does not limit the offense charged under the amended indictment because that phrase includes the commission of a rape after the murder. We disagree with the Commonwealth.

An indictment is a written charge against the accused for a specific crime that informs the accused of the nature and character of the offense charged against him. Code § 19.2-220. "It is elementary that what need not be proved need not be alleged, but sometimes . . . [the indictment] alleges something that it was not necessary to allege," requiring proof of "what . . . has [been] alleged unless the unnecessary allegation can be rejected as surplusage." <u>Mitchell v. Commonwealth</u>, 141 Va. 541, 555, 127 S.E. 368, 373 (1925). "If the unnecessary word or words inserted in the indictment describe, limit or qualify the

words which it was necessary to insert therein, then they are descriptive of the offense charged in the indictment and cannot be rejected as surplusage." Id. at 560, 127 S.E. at 374.

Code § 18.2-31(e), as the current subsection (5) was formerly designated, originally defined capital murder as the willful, deliberate, and premeditated killing of a person "during the commission of, or subsequent to, rape." In Harward v. Commonwealth, 229 Va. 363, 330 S.E.2d 89 (1985), comparing this language to language used in other subsections of Code § 18.2-31, we held that "[t]he phrase 'in the commission of' includes a killing before, during, and after the underlying felony, while the language 'during the commission of, or subsequent to' excludes a killing which occurs before a rape" of another person. Id. at 366, 330 S.E.2d at 91. In response to Harward, the General Assembly in 1988 amended subsection (e) to define the requisite killing to constitute capital murder as one "in the commission of, or subsequent to, [the] rape" of any person.

The Commonwealth contends that the discussion in Harward of the distinction between "during the commission of, or subsequent to" and "in the commission of" is dictum, and that we have subsequently rejected the distinction in Spencer, 238 Va. at 286, 384 S.E.2d at 781, relying on Coleman, 226 Va. at 51, 307 S.E.2d at 875. The Commonwealth's reliance on Spencer and

38

Coleman is misplaced in the present case.  In Spencer and Coleman, the issue was whether the evidence failed to show that the murder victim was alive at the time of the rape, not whether the rape of another person occurring after the death of the murder victim could serve as the gradation crime for capital murder.

It remains a valid principle that the Commonwealth is limited to the prosecution of the crime charged in the indictment because the accused is entitled to notice of the offense charged.  Thus, in the present case, once the Commonwealth chose, for whatever reason, to depart from the language of Code § 18.2-31(5) and to insert into the amended indictment the exact language that had been interpreted in Harward to exclude the killing of the murder victim before the rape of another person, it became bound to the more limited proof that the gradation crime was a rape occurring before or during the killing.  Accordingly, we hold that the trial court erred in instructing the jury that the gradation crime of rape was one occurring "before, during, or after" the murder and in subsequently responding to the jury inquiry that the rape of Kristie, which according to the evidence occurred after the

killing of Stacey, could serve as the gradation crime for the capital murder of Stacey.[10]

### F. Comment on Powell's Failure to Testify

Powell assigns error to the trial court's failure to grant a mistrial following the Commonwealth's alleged reference in closing argument to Powell's failure to testify.  Powell asserts the statement made by the Commonwealth's Attorney referred to Powell's "failure to tell [the jury] what his intent or motive was" for killing Stacey and "went to the central issue of the capital murder charge" only.  Accordingly, we will consider this issue in that context.

As a general rule, any comment that the Commonwealth's Attorney made referring to the defendant's election not to testify is a violation of his right against self-incrimination as guaranteed by the Fifth Amendment of the United States Constitution, Griffin v. California, 380 U.S. 609, 615 (1965), and Article I, Section 8 of the Constitution of Virginia and as explicated in Code § 19.2-268, Elliott v. Commonwealth, 172 Va. 595, 598-601, 1 S.E.2d 273, 274-76 (1939).  A comment is constitutionally and statutorily forbidden if " 'the language

---

[10] Because the trial court's response to the jury inquiry was erroneous, we need not address Powell's contention that the trial court erred in failing to permit him to present argument to the jury following that response being given.

40

used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " Hines v. Commonwealth, 217 Va. 905, 907, 234 S.E.2d 262, 263 (1977) (quoting Knowles v. United States, 224 F.2d 168, 170 (10th Cir.1955)).

Contrary to the Commonwealth's assertions at trial and in this Court, the context of the statement by the Commonwealth's Attorney does not clearly reference Powell's videotaped confession that he had raped Kristie and stabbed both Stacey and Kristie, but that he had not taken any money from their house. Although the Commonwealth's Attorney had mentioned Powell's admission in this videotape earlier in his argument, the issue here arose when he was arguing that the evidence, specifically Kristie's testimony and that of her mother, supported finding that Powell was rummaging through Stacey's possessions looking for money to steal as she lay dying "in a pool of blood." The Commonwealth's Attorney then stated:

> If you don't think [Stacey] kept money in her underwear drawer, acquit him. If you think her mother made that up, acquit him. But that's not the evidence.
>
> I'll say this to you[,] it's as likely as any scenario — but we'll never know because he hasn't told us . . . .

41

At that point, Powell's counsel interposed his objection, and the trial court directed that the objection would not be considered until the Commonwealth's argument concluded. The Commonwealth's Attorney then resumed his argument, asserting that after "letting [Stacey's] life's blood drain out," Powell "[g]oes and takes her money, goes through [her] house."

While it is not implausible that the Commonwealth's Attorney intended the statement "he hasn't told us" to refer to Powell's express denial that he had looked for money or something else to steal after stabbing Stacey, it is more likely that the jury would have taken the statement to be a comment on the failure of Powell to testify and offer rebuttal to the evidence to which the prosecutor had just alluded. Accordingly, we hold that the trial court erred in failing to find that the statement was an improper comment on Powell's failure to testify concerning his motive to kill Stacey.

However, Powell was ultimately acquitted of capital murder in the commission of robbery or attempted robbery and the associated charge of robbery or attempted robbery, and his conviction will be reversed on other grounds for the other capital murder charge. Accordingly, we hold that the trial court's error was harmless beyond a reasonable doubt. Dunn v. Commonwealth, 222 Va. 750, 753, 284 S.E.2d 807, 809 (1981).

### G. Sufficiency of the Evidence

42

Powell assigns error to the trial court's failure to strike the evidence as to the abduction of Kristie on the ground that the evidence was insufficient to support a jury finding that the restraint used exceeded that necessary to accomplish the crime of rape. We disagree.

A defendant may be convicted of abduction in addition to "another crime involving restraint of the victim, both growing out of a continuing course of conduct, . . . only when the detention committed in the act of abduction is separate and apart from, and not merely incidental to, the restraint employed in the commission of the other crime." Brown v. Commonwealth, 230 Va. 310, 314, 337 S.E.2d 711, 713-14 (1985). Here, there is sufficient evidence to support the finding of the jury that Powell used greater restraint than was necessary to commit rape.[11] First, Powell ordered Kristie to go to a more secluded part of the home prior to the rape. See, e.g., Wilson v. Commonwealth, 249 Va. 95, 103, 452 S.E.2d 669, 675, cert. denied, 516 U.S. 841 (1995). Although Powell did not display a weapon to her at that time, it is clear under the circumstances that Kristie was in reasonable fear for her life having just

---

[11] Restraint is not a necessary element of homicide. Thus, Powell's contention that the restraint of Kristie was not more than what was necessary incident to his attempt to kill her is without merit.

discovered her sister's lifeless body and being aware that Powell was usually armed.  Moreover, after the rape was complete, Powell bound Kristie and left her for some time before returning to attempt to kill her.  This restraint clearly exceeded that necessary to accomplish the rape.  See Hoke v. Commonwealth, 237 Va. 303, 311, 377 S.E.2d 595, 600, cert. denied, 491 U.S. 910 (1989).  Accordingly, we hold that the trial court did not err in failing to strike the evidence as to the charge of abduction.

Within the same assignment of error, Powell also asserts that the evidence was insufficient to support his conviction for the capital murder of Stacey "during the commission of or subsequent to" the rape of Kristie.  There is simply no evidence upon which the jury could have found that Powell committed the rape of Kristie before or during the murder of Stacey.  Indeed, it is undisputed that the rape occurred after the murder was completed.  Accordingly, the evidence was insufficient to support Powell's conviction for capital murder as charged in the amended indictment.[12]

---

[12] For the reasons previously stated in this opinion, Powell's conviction for that crime will be reversed, and he will not be subject to retrial for that offense.  Accordingly, we need not address the error assigned to the trial court's failure to poll the jury with respect to whether the rape occurred before, during, or after the murder.

Although we have already determined that the conviction underlying Powell's death sentence will be reversed, we now turn to an issue raised by Powell during the penalty-determination phase of his trial which is critical to the proper prosecution of capital murder cases and will be instructive to future capital murder trials.

Powell assigns error to the trial court's failure to grant his request that the jury be given verdict forms which expressly stated the jury's option of imposing a life sentence or a life sentence and a fine where the jury found one or both of the aggravating factors to be present. We note that this case presents the first opportunity to address this issue which was properly preserved by an objection to the failure of the trial court to provide the jury with such verdict forms.[13] Cf. Burns v. Commonwealth, 261 Va. 307, 343 n.16, 541 S.E.2d 872, 896 n.16 (2001); Orbe v. Commonwealth, 258 Va. 390, 403 n.13, 519 S.E.2d 808, 816 n.13 (1999), cert. denied, 529 U.S. 1113 (2000). In

---

[13] In considering this issue, we disregard the testimony of the jury foreperson received during the sentencing hearing that she did not understand the trial court's instruction on sentencing because the verdict forms failed to contain express reference to the imposition of a life sentence where the jury found one or both of the aggravating factors to be present. We concur in the trial court's observation that her testimony is tainted by her subsequent relationship with Powell.

both Orbe and Burns, we held that the failure to object to the nature of the verdict forms at trial barred consideration of that issue on appeal. In Orbe, we went on to state that "[t]he defendant based his motion [to assert the issue for the first time on appeal] on the recent decision of this Court in Atkins v. Commonwealth, 257 Va. 160, [179,] 510 S.E.2d 445[, 457] (1999). . . . [W]e note that the verdict form in this case did not have the problem addressed in Atkins." Orbe, 258 Va. at 403 n.13, 519 S.E.2d at 816 n.13.

In Atkins, the jury, although properly instructed as to the sentencing options available, was not provided with a verdict form which allowed it to impose a life sentence or life sentence and a fine if it found that neither of the aggravating factors had been proven beyond a reasonable doubt. We held that this omission resulted in the jury being "presented with a confusing situation in which the trial court's instructions and the form the jury was given to use in discharging its obligations were in conflict." Atkins, 257 Va. at 179, 510 S.E.2d at 457.

The Commonwealth asserts that, unlike Atkins, the jury in the present case was provided with forms that would have allowed it to discharge its obligations because the forms provided to the jury comported with the required language of Code § 19.2-264.4(D). The Commonwealth further contends that because we have held that the sentencing verdict forms prescribed by Code

46

§ 19.2-264.4(D) are not unconstitutionally vague, the trial court has the discretion to reject a defendant's request for an alternative form.  See Roach v. Commonwealth, 251 Va. 324, 336, 468 S.E.2d 98, 105, cert. denied, 519 U.S. 951 (1996).

Code § 19.2-264.4(D) provides:

The verdict of the jury shall be in writing, and in one of the following forms:

(1) "We, the jury, on the issue joined, having found the defendant guilty of (here set out statutory language of the offense charged) and that (after consideration of his prior history that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society) or his conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved (torture) (depravity of mind) (aggravated battery to the victim), and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death.

Signed .........., foreman"

or

(2) "We, the jury, on the issue joined, having found the defendant guilty of (here set out statutory language of the offense charged) and having considered all of the evidence in aggravation and mitigation of such offense, fix his punishment at imprisonment for life.

Signed .........., foreman"

We begin by noting that the statute makes no reference to the alternative sentence of imprisonment for life and a fine of not more than $100,000.  Originally, the punishment for capital murder was limited to the options of a sentence of death or one

47

of life imprisonment.  In 1991, the General Assembly amended

Code § 18.2-10 in include the additional option of imposing a

fine of not more than $100,000 in addition to a sentence of life

imprisonment.[14]  At that time, the General Assembly failed to

amend Code § 19.2-264.4(D) to reflect this change in the range

of sentences available for capital murder and the two statutes

have since remained in conflict.[15]

Because these statutes are in conflict, we must resort to

rules of statutory construction to determine which should

control.  Wertz v. Grubbs, 245 Va. 67, 70, 425 S.E.2d 500, 501

(1993); see also Moore v. Commonwealth, 155 Va. 1, 11, 155 S.E.

635, 638 (1930).  "In such circumstances as this, we have

employed the established rule of statutory construction that

when one statute speaks to a subject generally and another deals

---

[14] A fine may not be imposed in addition to a sentence of death.  Code § 18.2-10(g).

[15] We note further that the description of the aggravating factors in Code § 19.2-264.4(D)(1) is also erroneous.  First, the two factors are listed in the disjunctive although it is possible for the jury to find that a death sentence is warranted upon finding that both aggravating factors have been proven beyond a reasonable doubt.  Second, although the description of the future dangerousness aggravating factor is set out in a parenthetical, indicating that the language need not be used if not appropriate to the circumstances, only a portion of the description of the vileness aggravating factor is within a parenthetical, implying that the language "his conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved" is required as part of the verdict form even where vileness is not at issue.

48

with an element of that subject specifically, the statutes will be harmonized, if possible, and if they conflict, the more specific statute prevails." Commonwealth v. Brown, 259 Va. 697, 706, 529 S.E.2d 96, 101 (2000). Clearly, Code § 18.2-10, the statute that prescribes the punishment for capital murder, is the more specific of the two and, accordingly, it must prevail. Thus, we hold that, at a minimum, the jury must receive a verdict form that, in addition to addressing the imposition of a sentence of death and the imposition of a sentence of life imprisonment, also allows the jury to impose a sentence of life imprisonment and a fine of up to $100,000. Cf. Lenz v. Commonwealth, 261 Va. 451, 472, 544 S.E.2d 299, 308 (2001) (holding that failure to object to absence of verdict form providing for imposition of life sentence and a fine barred consideration of issue on appeal).

During oral argument of these appeals, the Commonwealth contended that, since it had included among its verdict forms ones that would have permitted the imposition of a sentence of life imprisonment and a sentence of life imprisonment and a fine, there is no "Atkins problem" in this case because there was no conflict between "the trial court's instructions and the form[s] the jury was given to use in discharging its obligations." Atkins, 257 Va. at 179, 510 S.E.2d at 457. In other words, the Commonwealth contends that, so long as the jury

49

was presented with verdict forms that allowed it to impose each of the legal sentences for capital murder, it was not error for the trial court to provide verdict forms that failed to expressly reflect its instruction that the jury had the option of imposing a life sentence or a life sentence and a fine where the jury found one or both of the aggravating factors to be present.

As in Orbe, we agree that this issue is not controlled by Atkins.  However, we did not reach this issue in Atkins because the verdict forms that were provided to the jury in that case expressly provided that the jury had the option of imposing a life sentence or a life sentence and a fine if it found one or both of the aggravating factors to be present.  In Orbe and Burns this issue was not properly preserved.  Here, Powell made a proper request to have such language included in the verdict forms provided to the jury.

The issue is not whether the jury was provided with the means to discharge its obligation.  If that were the only goal, it could be achieved by providing the jury with a generic verdict form and advising the jury to fill in the particulars of the sentence from the instructions.  Rather, the issue is whether the jury is likely to be confused where it is instructed that it may impose a sentence other than death if it finds one or both of the aggravating factors have been proven beyond a

50

reasonable doubt, but receives verdict forms that do not expressly state that the jury is allowed to fix a sentence of life imprisonment even though one or both aggravating factors are present.

The rationale of Atkins flows from the principle that "it is materially vital to the defendant in a criminal case that the jury have a proper verdict form." Atkins, 257 Va. at 178, 510 S.E.2d at 456. That rationale may be extended to the provision of jury verdict forms with sentencing options that accurately and expressly correspond to the trial court's sentencing instruction. Accordingly, we hold that in a capital murder trial, the trial court must give the jury verdict forms providing expressly for the imposition of a sentence of imprisonment for life and a fine of not more than $100,000 when the jury finds that one or both of the aggravating factors have been proven beyond a reasonable doubt.

IV. CONCLUSION

Having already determined that Powell's conviction for capital murder will be reversed, we now further determine that there is no basis upon which Powell can be retried for capital murder on remand. The poll of the jury establishes that Powell was acquitted of the charge of capital murder in the commission of robbery or attempted robbery. It is equally clear that there is simply no evidence upon which the jury could have relied to

find that Powell committed or attempted to commit any sexual assault against Stacey before or during her murder, or that the rape of Kristie did not occur after the murder of her sister. Accordingly, under the circumstances of this case, the evidence at best would have supported a conviction for first degree murder.

For these reasons, we will reverse Powell's conviction for capital murder, affirm his convictions for abduction, rape, attempted capital murder, and grand larceny, and remand the case for a new trial on a charge of no greater than first degree murder for the killing of Stacey Reed, if the Commonwealth be so advised.

<u>Affirmed in part, reversed in part, and remanded</u>.

52