COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Clements and Petty
Argued at Salem, Virginia


JESSE JAMES DUNAWAY, S/K/A
  JESSIE JAMES DUNAWAY, JR.
                                                           OPINION BY
v.      Record No. 1904-06-3                    JUDGE JEAN HARRISON CLEMENTS
                                                           JULY 15, 2008
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HALIFAX COUNTY
Leslie M. Osborn, Judge

Mark T. Williams (Gregory T. Casker, on brief), for appellant.

Eugene Murphy, Senior Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee.


       Jesse James Dunaway (appellant) was convicted in a jury trial of being the principal, or a

principal administrator, organizer, or leader, of a continuing criminal enterprise engaged, during

a one-year period, in the distribution of at least five kilograms of a mixture containing cocaine

base, in violation of Code § 18.2-248(H2), and sentenced to life imprisonment.[1]  On appeal, he

contends the trial court erred in (1) amending the indictment to allege a greater amount of a

mixture containing cocaine base, (2) finding the evidence sufficient, as a matter of law, to

support his conviction, and (3) refusing to find that the imposition of a life sentence constituted

cruel and unusual punishment.  Finding no error, we affirm the trial court's judgment and

appellant's conviction and sentence.

---

       [1] Appellant was also convicted in the same proceeding of attempting to manufacture
marijuana and of conspiring to distribute marijuana.  On appeal, he does not challenge those
convictions or the sentences he received for those convictions.

I. BACKGROUND

"Under familiar principles of appellate review, we view the evidence and all reasonable inferences fairly deducible from that evidence in the light most favorable to the Commonwealth, the party that prevailed below." Banks v. Commonwealth, 41 Va. App. 539, 543, 586 S.E.2d 876, 877 (2003). "In so doing, we must discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." Cirios v. Commonwealth, 7 Va. App. 292, 295, 373 S.E.2d 164, 165 (1988).

So viewed, the evidence established that, from December 5, 2003, to December 5, 2004, appellant maintained two locations in South Boston from which crack cocaine was sold.[2] One was a house on College Street, which appellant used primarily for selling crack to users. Twenty to thirty people a day, or more, purchased crack at that location. The other location was appellant's residence on Carrington Street, which he used primarily for selling crack to dealers.

From December 2003 until he was arrested on December 2, 2004, George Thaxton spent "six or seven" hours every day at the College Street house selling crack with appellant. Thaxton's primary responsibilities were to make sure "[n]obody [got] out of hand" and to "mak[e] sure nothing happened" to appellant. The owner of a short-barreled pistol that fired two shotgun shells at once, Thaxton protected appellant by putting "people in their place . . . physically and with a little artillery if need be."

According to Thaxton, appellant obtained the crack he needed by purchasing an eighth of a kilogram (125 grams) of crack "two to three times every single week" during the entire year at

---

[2] As further discussed below in section III(A) of this opinion, the phrase "crack cocaine" and its equivalent variant "crack" are commonly used terms for "cocaine base." See, e.g., United States v. Kelly, 519 F.3d 355, 363 (7th Cir. 2008) (noting that "crack cocaine" is a "form of cocaine base" and that "'[c]rack' is a street term" for crack cocaine). We use the terms "crack cocaine" and "crack" interchangeably in this opinion.

issue. Appellant paid approximately $3,500 in cash for each eighth of a kilogram of crack he purchased. To make a purchase, appellant provided "the money first"—a six-inch stack of twenty- and hundred-dollar bills—and received "a bag" containing an eighth of a kilogram of crack in return. Appellant then divided the crack into smaller amounts, which he sold on a retail basis to users and on a wholesale basis to dealers, or used to pay people for services they provided his crack-dealing business.

Thaxton sometimes got a quarter ounce (7.09 grams) of crack from appellant, which he then "cut . . . up and sold." Thaxton, who had been selling crack for nine years, knew the substance appellant and he were selling was crack because the "people who [were] smoking it . . . never said anything" to indicate it was not real. Sometimes, Thaxton "gave it to somebody to taste" to make sure it was real. One person he used as a taster was Marshall Scott.

Scott rented the College Street house and lived there. Appellant paid him in crack for letting him use the house to deal drugs, as well as for watching the front door when appellant was there and for chauffeuring appellant between the College Street and Carrington Street houses and "to the store." Scott also got crack from appellant for cleaning and cooking at the College Street house.

From December 2003 until she was incarcerated on September 11, 2004, Shirley Majors helped Scott watch the front door at the College Street house when appellant was conducting business there. According to Majors, appellant sold crack at the house every day, "[s]tarting from lunch up to late at night." Scott and Majors stayed in the front of the College Street house and let customers they knew in the door. When they did not know the person at the door, Majors or Scott would notify appellant, who waited in the back of the house, before they let the person in. Appellant gave Majors crack for watching the door. Appellant also gave Majors crack in exchange for cleaning the Carrington Street house. Majors, who had been using crack since 1996 and knew

how it made her feel, smoked crack at the house all day, every day. According to her, all the crack she got and smoked at the house was real crack.

In addition to employing the services of Thaxton, Scott, and Majors, appellant gave crack to Pookie Torrian and Wayne Torrian in exchange for their doing maintenance and yard work at the College Street house. Appellant also gave crack to Wayne Torrian for cleaning the Carrington Street house and paid William Michael White two grams of crack to do electrical work at that house in December 2003.

From December 2003 until he was incarcerated on February 16, 2004, White also purchased two to six grams of crack a day, four or five days a week from appellant. He smoked half of it himself and sold the rest to his three dozen or so customers. A long-time crack user who knew how crack made him feel when he smoked it, White always got "high" from the crack he bought from appellant. Although he sometimes went to appellant's house on Carrington Street, White was at the College Street house "most of the time."

From December 2003 to December 2004, Mervin Traynham also purchased crack from appellant at both the College Street and Carrington Street houses. He bought the crack in ounces and "cut it down" into smaller amounts, "[a]nywhere from grams to half ounces," which he sold to "smokers and small-time dealers." Paying $700 to $1,000 an ounce, he bought at least eight ounces (226.8 grams) of crack each month from appellant throughout the entire year. According to Traynham, appellant's business arrangement at the College Street house was "prime" and "on point": "[Y]ou had people watching to see who was coming, who was going. You had somebody at the door. . . . [E]verything was together." There was also some "[s]hooting dice" and "a little tricking" going on there. In contrast, the Carrington Street house was "more laid back" because there were only "three or four people" there and they were "all dealers": "You come, get what you want, and you get out, . . . simple as that." Traynham would call appellant and tell him what he

needed, and it would be there ready for him to pick up when he arrived at the designated house. A long-time crack dealer and experienced crack "cook," Traynham knew the crack he purchased from appellant was real because he not only used a "personal tester" to verify the authenticity of the crack he purchased, he also confirmed its validity visually and by "tast[ing] it with [his] tongue," a method that had never failed him—"not once." He tested "every batch" he purchased because he did not "want to sell somebody something [that was] not real."

From December 2003 until he was incarcerated on July 16, 2004, Jeremy Hutcherson purchased a quarter of an ounce (7.09 grams) to a half of an ounce (14.18 grams) of crack from appellant approximately forty-five times. He called appellant on the phone to set up the purchases and paid $250 for each quarter of an ounce and $350 for each half of an ounce. Hutcherson then divided the crack he bought from appellant into smaller amounts, which he sold to his customers. Hutcherson, who had been dealing crack for more than ten years, could identify crack by its appearance and smell. He also sometimes confirmed the substance was crack by using a taster or by watching his customers smoke it. On at least one occasion, Hutcherson saw appellant get crack out of a dresser drawer in the Carrington Street house that contained "a large amount" of crack.

During that time, appellant also recruited experienced, former crack dealers to deal for him. For instance, when Antonio Singleton, who had not dealt drugs for two years, lost his job in December 2003, appellant helped him "get back into [dealing drugs] again." From that point on, Singleton purchased crack exclusively from appellant until Singleton's arrest on September 10, 2004. When Singleton needed more crack, he called appellant and told him what he needed, and it would be waiting for him at the Carrington Street house when he arrived. When appellant was unable to immediately provide the crack Singleton needed, Singleton waited until appellant could fill his order. If Singleton did not have enough money to cover a purchase, appellant sold it to him on credit.

In December 2003, Singleton distributed five to six grams of cocaine a day. In January and February 2004, he distributed two to three "eight balls" (7.09 to 10.63 grams) a day, four days a week. He paid appellant $140 for each "eight ball." From March through May, he distributed approximately one ounce (28.35 grams) of crack a week. From June until he was arrested in September, he distributed two ounces (56.70 grams) of crack a week. Singleton paid appellant $900 "every time [he] bought an ounce" of crack. He then "cut it up into twenty pieces," which he sold for a total of $2,200. Eventually, he had twenty-five to thirty-five steady customers. Singleton, who had previously dealt crack "[a]lmost every day" for six years, could identify crack visually and by taste. He had never mistakenly identified a substance as being crack that turned out not to be real. He also knew what he sold was real crack because his "customers would [have] let [him] know" if it was not.

In March 2004, appellant gave Sherwood Barksdale, who had just gotten out of prison, some money and a few grams of crack to get him started dealing crack again. Barksdale then purchased crack from appellant "five or six times" before he was once more incarcerated in June 2004. In total, he purchased "about an ounce" (28.35 grams) of crack from appellant. Barksdale, who started dealing crack in 1991, could identify crack visually and by its "funny" smell. Additionally, he tried to buy only from suppliers he knew in order to make sure the crack he got was real. He never "had a problem with that issue" in his dealings with appellant.

Appellant also recruited Marquette Duncan as a distributor. Shortly after Duncan was released from incarceration in May 2004, appellant gave him a gram of crack to help him restart his career as a dealer. Thereafter, Duncan bought the crack he distributed exclusively from appellant. He distributed two to three grams of crack a day until he was incarcerated again in November 2004.

On December 2, 2004, police arrested appellant during a raid on the College Street house. In searching the College Street and Carrington Street houses, the police recovered over seven grams of a substance that subsequent laboratory analysis revealed was crack cocaine.

On April 5, 2005, a multi-jurisdictional grand jury returned an indictment that alleged, in pertinent part, as follows:

> Between May 2003 to December 2004, the accused, JESSE DUNAWAY, was a principal, or one of several principal administrators, organizer, or leader of a continuing criminal enterprise which sold or possessed with the intent to sell at least 2.5 kilograms but less than 5 kilograms of a mixture containing cocaine base . . . during any 12 month period of the continuing criminal enterprises' [sic] existence, in violation of § 18.2-248(H1).

On January 31, 2006, having received additional information from "other people" who came forward that appellant was responsible for the distribution of more than five kilograms of crack in a year's time, the Commonwealth filed a motion pursuant to Code § 19.2-231 to amend the indictment to charge a violation of Code § 18.2-248(H2), rather than Code § 18.2-248(H1). Following a hearing on the motion on February 24, 2006, the trial court granted the Commonwealth's motion and amended the indictment to allege, in pertinent part, as follows:

> Between December 5, 2003 to December 5, 2004, the accused JESSE DUNAWAY, was a principal, or one of several principal administrators, organizer or leader of a continuing criminal enterprise which sold or possessed with the intent to sell at least 5 kilograms of a mixture containing cocaine base . . . during any 12 month period of the continuing criminal enterprises' [sic] existence, in violation of § 18.2-248(H2).

Appellant was tried before a jury and convicted as charged on March 22, 2006. The jury fixed appellant's punishment at life imprisonment, as required by Code § 18.2-248(H2), and the trial court imposed that sentence.

This appeal followed.

## II.  AMENDMENT OF THE INDICTMENT

On appeal, appellant contends the trial court erred in amending the indictment from charging him, under Code § 18.2-248(H1), with the distribution, or possession with the intent to distribute, of "at least 2.5 kilograms but less than 5 kilograms of a mixture containing cocaine base" to charging him, under Code § 18.2-248(H2), with the distribution, or possession with the intent to distribute, of "at least 5 kilograms of a mixture containing cocaine base."  Relying on Powell v. Commonwealth, 261 Va. 512, 552 S.E.2d 344 (2001), appellant maintains the amendment of the indictment to allege a greater amount of a mixture containing cocaine base was impermissible under Code § 19.2-231 because it changed the nature or character of the offense charged.[3]  Thus, he argues, the Commonwealth had to obtain an indictment for the amended charge before he could be tried on that charge.  We disagree.

"The purpose of an indictment 'is to give an accused notice of the nature and character of the accusations against him in order that he can adequately prepare to defend against his accuser.'"  Walshaw v. Commonwealth, 44 Va. App. 103, 109, 603 S.E.2d 633, 636 (2004) (quoting King v. Commonwealth, 40 Va. App. 193, 198, 578 S.E.2d 803, 806 (2003)).  Where there is a "variance between the allegations [in the indictment] and the evidence offered in proof thereof," the trial court may amend the indictment "at any time before the jury returns a verdict or the court finds the accused guilty or not guilty, *provided the amendment does not change the nature or character of the offense charged*."  Code § 19.2-231 (emphasis added).  Code § 19.2-231 "is remedial in nature and is to be liberally construed in order to achieve the laudable purpose of avoiding further unnecessary delay in the criminal justice process by allowing amendment, rather

---

[3] Appellant does not claim, nor can he, that he was entitled to a continuance due to any surprise caused by the amendment.  See Willis v. Commonwealth, 10 Va. App. 430, 438, 393 S.E.2d 405, 409 (1990) (holding that a defendant cannot "claim that the amendment surprised" him when the motion to amend was filed "well in advance of trial").

than requiring reindictment by a grand jury." Powell, 261 Va. at 533, 552 S.E.2d at 356. Nevertheless, "[t]he limitation on amendment to indictments in Code § 19.2-231 to amendments that do not change the nature or character of the offense is clearly intended to protect the defendant from being deprived of notice of the offense charged." Rawls v. Commonwealth, 272 Va. 334, 346, 634 S.E.2d 697, 702 (2006); see Sullivan v. Commonwealth, 157 Va. 867, 877, 161 S.E. 297, 300 (1931) ("The manifest purpose of [the statutory predecessor to Code § 19.2-231] is to allow amendments which avoid unnecessary delays and further the ends of justice, without prejudice to the substantial right of the accused to be informed of the accusation, and to one fair trial on the merits.").

Accordingly, to resolve the question whether the trial court erred in amending the indictment to allege a greater amount of a mixture containing cocaine base, we must determine whether that amendment changed the nature or character of the offense charged. If it did not, it was a permissible amendment under Code § 19.2-231. See Sullivan, 157 Va. at 876-78, 161 S.E. at 299-300 (holding that the amendment of the indictment was "permissible under [the statutory predecessor to Code § 19.2-231]" because the amendment "did not, within the meaning of the statute, change the nature of the offense charged in the original indictment"); cf. Rawls, 272 Va. at 346, 349, 634 S.E.2d at 703, 704 (holding that the "nature or character" test set forth in Code § 19.2-231 applies to both indictments and warrants and that, "since the amendment [at issue in the case] did not change the nature or character of the offense charged, . . . the trial court did not err in allowing the trial to proceed on the amended warrant"). And, conversely, if the amendment changed the nature or character of the offense charged, it was impermissible. See Powell, 261 Va. at 534-35, 552 S.E.2d at 356-57 (holding that the "amendment made to the indictment in this case was not authorized by Code § 19.2-231" because "the amended indictment materially changed the nature of the offense originally charged").

Here, the indictment returned by the grand jury charged appellant with being the principal, or principal administrator, organizer, or leader, of a continuing criminal enterprise engaged, over the course of a year, in the distribution, or possession with the intent to distribute, of "at least 2.5 kilograms but less than 5 kilograms of a mixture containing cocaine base . . . , in violation of [Code] § 18.2-248(H1)." Code § 18.2-248(H1) provides, in pertinent part, as follows:

> Any person who was the principal or one of several principal administrators, organizers or leaders of a continuing criminal enterprise shall be guilty of a felony if . . . the person engaged in the enterprise to manufacture, sell, give, distribute or possess with the intent to manufacture, sell, give or distribute the following during any 12-month period of its existence:
>
> \* \* \* \* \* \* \*
>
> 3. At least *2.5 kilograms but less than 5.0 kilograms* of a mixture . . . which contains cocaine base;
>
> \* \* \* \* \* \* \*
>
> A conviction under this section shall be punishable by a fine of not more than $1 million and imprisonment for *20 years to life . . . .*

(Emphasis added).

Following appellant's indictment, the Commonwealth received additional evidence that, during the relevant one-year period, appellant had actually distributed or possessed with the intent to distribute "at least 5 kilograms of a mixture containing cocaine base." Accordingly, the Commonwealth filed a pretrial motion to have the indictment amended to conform to the evidence it expected to adduce at trial and to inform appellant that, due to the increased amount of the mixture containing cocaine base, he was being charged under Code § 18.2-248(H2), rather than Code § 18.2-248(H1). The trial court granted the Commonwealth's motion and amended the indictment to reflect a charge under Code § 18.2-248(H2), which provides, in pertinent part, as follows:

- 10 -

Any person who was the principal or one of several principal administrators, organizers or leaders of a continuing criminal enterprise if . . . the person engaged in the enterprise to manufacture, sell, give, distribute or possess with the intent to manufacture, sell, give or distribute the following during any 12-month period of its existence:

\* \* \* \* \* \* \*

3. At least *5.0 kilograms* of a mixture . . . which contains cocaine base;

\* \* \* \* \* \* \*

shall be guilty of a felony punishable by a fine of not more than $1 million and imprisonment *for life* . . . .

(Emphasis added).

It is clear, therefore, that the amendment of the indictment had the effect of changing only the amount of the mixture containing cocaine base to be proved by the Commonwealth and the mandatory minimum punishment appellant faced if convicted. The amendment did not alter the essential, underlying conduct on the part of appellant that was charged in the original indictment—that is to say, "[t]he overt acts constituting the crime [remained] the same." Sullivan, 157 Va. at 876, 161 S.E. at 300. Both indictments charged appellant with being the principal, or a principal administrator, organizer, or leader, of a continuing criminal enterprise engaged in the distribution, or possession with the intent to distribute, of a substantial amount of a mixture containing cocaine base. The increased amount of the mixture distributed, or possessed with the intent to distribute, did "not change [the crime's] general nature or character, because whichever [amount was] shown, the crime [was] of the same nature—that is, a felony of the specific class denounced by the statute." Id. "That the punishment for such a crime differs with the differing [amount] does not within the meaning of [Code § 19.2-231], authorizing amendment to indictments, change the nature of the crime charged." Id. Indeed, "[w]ith regard to amendment of indictments, . . . 'the bare fact that the amendment allowed authorizes a greater

- 11 -

punishment than that authorized for the offense charged in the original indictment does not of itself change the character of the offense charged.'" Rawls, 272 Va. at 348, 634 S.E.2d at 704 (quoting Sullivan, 157 Va. at 877, 161 S.E. at 300). Here, the amendment merely subjected appellant to a higher mandatory minimum punishment for the same offense.

Moreover, where there is "similarity of purpose and subject matter" of the Code sections involved, "an amendment to an indictment [that merely] changes the Code provision under which a defendant is charged . . . does not change 'the nature or character of the offense charged' and is permissible under the provisions of [Code] § 19.2-231." Edwards v. Commonwealth, 218 Va. 994, 1003, 243 S.E.2d 834, 839 (1978) (quoting Code § 19.2-231). Here, the two statutory subsections under which appellant was charged in the original and amended indictments—Code § 18.2-248(H1) and Code § 18.2-248(H2), respectively—are not only both part of the same Code section, they have a similar "purpose and subject matter."

Appellant argues the Supreme Court's decision in Powell is controlling and supports his position that the trial court's amendment to the indictment was improper under Code § 19.2-231. The Court in Powell, however, addressed the amendment of an indictment that had the effect of adding a new charge to the indictment. Noting the "liberal construction afforded to promote the remedial purpose of Code § 19.2-231," the Court held that "the pre-trial amendment of an indictment charging one theory of capital murder to include an alternative and additional theory of capital murder" impermissibly "expanded the indictment to include a new and additional charge of capital murder." Powell, 261 Va. at 533-34, 552 S.E.2d at 356. "As a result, under the amended indictment Powell could have been convicted and sentenced" on two counts of capital murder even though he had been charged with only "a single count of capital murder" in the original indictment. Id. at 534, 552 S.E.2d at 356-57.

Here, appellant was charged with only a single count of being the principal, or a principal administrator, organizer, or leader, of a continuing criminal enterprise under both the original and amended indictments. Thus, appellant's reliance on Powell is misplaced.

We hold, therefore, that, because it served only to change the punishment authorized for the offense charged and did not add a new charge or otherwise change the nature or character of the offense charged, the trial court's amendment of the original indictment to allege a greater amount of a mixture containing cocaine base was permissible under Code § 19.2-231. Accordingly, the trial court did not err in making that amendment.

### III. SUFFICIENCY OF THE EVIDENCE

Appellant next contends the trial court erred in finding the evidence sufficient, as a matter of law, to support his conviction. Specifically, he argues the Commonwealth failed to prove (1) the substance he distributed was a mixture containing "cocaine base," (2) he distributed "at least five kilograms" of a mixture containing cocaine base, and (3) the organization in which he was engaged was a "continuing criminal enterprise." We disagree.

"We review questions of law, and mixed questions of law and fact, utilizing a de novo standard of review." Muhammad v. Commonwealth, 269 Va. 451, 479, 611 S.E.2d 537, 553 (2005). "In reviewing the sufficiency of the evidence to sustain a conviction, 'we determine whether the evidence, viewed in the light most favorable to the prevailing party, the Commonwealth, and the reasonable inferences fairly deducible from that evidence support each and every element of the charged offense.'" Gilbert v. Commonwealth, 47 Va. App. 266, 270, 623 S.E.2d 428, 430 (2005) (quoting Haskins v. Commonwealth, 31 Va. App. 145, 149-50, 521 S.E.2d 777, 779 (1999)). We will affirm the conviction "unless it is plainly wrong or without evidence to support it." Shackleford v. Commonwealth, 262 Va. 196, 209, 547 S.E.2d 899, 906 (2001).

As previously indicated, to obtain appellant's conviction under Code § 18.2-248(H2), the Commonwealth had to prove beyond a reasonable doubt that appellant "was the principal or one of several principal administrators, organizers or leaders of a continuing criminal enterprise" and that, while such, he "engaged in the enterprise to manufacture, sell, give, distribute or possess with the intent to manufacture, sell, give or distribute" "at least 5.0 kilograms of a mixture . . . which contains cocaine base" "during any 12-month period of [the enterprise's] existence." Code § 18.2-248(H2).

## A. Cocaine Base

Appellant argues the evidence was insufficient to prove the substance he distributed was a mixture that contained "cocaine base," as required by Code § 18.2-248(H2). We disagree.

Because nearly all of the witnesses who testified at trial referred to the substance being distributed as "crack," we must first determine whether "crack" qualifies as a mixture that contains "cocaine base" under Code § 18.2-248(H2).[4] We conclude that it does.

"'Crack' is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." U.S. Sentencing Guidelines § 2D1.1(c), Note (D); see also United States v. Kelly, 519 F.3d 355, 359 (7th Cir. 2008) ("The two most common types of cocaine found in the United States are cocaine hydrochloride, which typically takes the form of a white powder and is water soluble, and crack cocaine, a form of cocaine base that typically takes a chunky, rock-like form and is not water soluble. . . . [Crack cocaine is] typically referred to as 'crack.'"). One form of cocaine base is "cocaine free base (known as 'crack')." 42 U.S.C. § 290bb-21. "The term 'freebase' means 'to purify (cocaine) by dissolving it in a heated solvent and separating and drying the precipitate' or 'to use (cocaine purified in this way) by burning it and inhaling the

---

[4] Neither Virginia's Code nor its case law defines "crack" or "cocaine base."

fumes.'" Posters 'N' Things, Ltd. v. United States, 511 U.S. 513, 515 n.3 (1994) (quoting American Heritage Dictionary 723 (3d ed. 1992)). Cocaine base is "smokable" and therefore "more potent than ordinary powder cocaine." United States v. Edwards, 397 F.3d 570, 571, 573-74 (7th Cir. 2005) (describing differences between "powder cocaine," cocaine "freebase," and "crack" cocaine). While courts have divided over whether "all cocaine base is crack," there is universal agreement that all "crack is cocaine base." Id. at 571; see also, e.g., United States v. Booker, 543 U.S. 220, 227 (2005) (equating "crack" with "cocaine base"); Edwards v. United States, 523 U.S. 511, 513 (1998) (same); United States v. Ramos, 462 F.3d 329, 336 n.2 (4th Cir. 2006) (same).

In agreement with this universal consensus, a forensic drug chemist testified at trial that "powder" and "crack cocaine" are the "common use names" for cocaine hydrochloride and cocaine base, respectively. He explained that normal or "classical cocaine has hydrochloride attached to it" and is readily soluble in water. He further explained that, with the hydrochloride removed, what remains is cocaine base, "referred to commonly as crack cocaine."

In sum, since crack cocaine is a specific form of cocaine base, identification of a substance as "crack cocaine" or "crack" proves it is "cocaine base."

Appellant maintains that the only way to sufficiently identify a substance as crack is through "chemical analysis," and he complains that only a small portion of the substance distributed by the continuing criminal enterprise was so analyzed. The identification of crack, he argues, cannot be based on the "suppositions and speculation of lay witnesses."

Under settled principles, however, when a substance cannot be "recovered, tested or introduced into evidence," its nature "can be proved by proof of the circumstances and effects of its use." Floyd v. Commonwealth, 31 Va. App. 193, 199, 522 S.E.2d 382, 385 (1999) (citing Hill v. Commonwealth, 8 Va. App. 60, 379 S.E.2d 134 (1989) (en banc)). Courts do not require

- 15 -

"scientific certainty" to determine the "chemical composition of an alleged controlled substance," and "'scientific identification of a substance is [not] an absolute prerequisite to conviction for a drug-related offense.'" United States v. Uwaeme, 975 F.2d 1016, 1019-20 (4th Cir. 1992) (quoting United States v. Schrock, 855 F.2d 327, 334 (6th Cir. 1988)). Indeed, "lay testimony and circumstantial evidence may be sufficient, without the introduction of an expert chemical analysis" to establish the identity of an illegal drug. United States v. Dolan, 544 F.2d 1219, 1221 (4th Cir. 1976). For instance, "[u]sers and addicts, if they have gained a familiarity or experience with the drug, may identify it." Hill, 8 Va. App. at 63, 379 S.E.2d at 136. Thus, even though the identity of the substance is an element of the crime, courts "will uphold a conviction as long as the evidence that the substance was illegal is adequate." Uwaeme, 975 F.2d at 1020 (citing United States v. Scott, 725 F.2d 43, 45 (4th Cir. 1984) (upholding a drug-possession conviction where "the Government's evidence consist[ed] of merely lay testimony on the nature of the substance in question")).

Appellant cites Hinton v. Commonwealth, 15 Va. App. 64, 421 S.E.2d 35 (1992), in support of his argument that lay testimony is generally insufficient to identify a substance in a drug case. In Hinton, however, the Commonwealth failed to establish the witness' "previous 'familiarity or experience' with the drug or provide other foundation for her conclusion" that the substance she had purchased was, in fact, cocaine. 15 Va. App. at 66, 421 S.E.2d at 37.

Here, conversely, knowledgeable "parties treated the substance" at issue as crack. Uwaeme, 975 F.2d at 1020. The Commonwealth established that the witnesses who obtained the substance from appellant were either experienced crack dealers or crack addicts. Thaxton, who had been selling crack for nine years, knew the substance appellant was selling was crack because the "people who [were] smoking it . . . never said anything" to indicate it was not real. Sometimes, Thaxton "gave it to somebody to taste" to make sure it was real. Singleton, who had previously

dealt crack "[a]lmost every day" for six years, could identify crack visually and by taste. He had never mistakenly identified a substance as being crack that turned out not to be real. He also knew what he sold was real crack because his "customers would [have] let [him] know" if it was not. Barksdale, who started dealing crack in 1991, could identify crack visually and by its smell. He never "had a problem with" the "crack" he bought from appellant. Traynham, a long-time crack dealer and experienced crack "cook," knew the "crack" he purchased from appellant was real because he not only used a "personal tester" to verify the authenticity of the crack he purchased, he also confirmed its validity visually and by "tast[ing] it with [his] tongue," a method that had never failed him—"not once." He tested "every batch" he purchased because he did not "want to sell somebody something [that was] not real." Hutcherson, who had been dealing crack for more than ten years, could identify crack by its appearance and smell. He also confirmed the substance was crack through the use of a taster or by watching his customers smoke it. Majors, who had been using crack since 1996 and knew how it made her feel when she smoked it, indicated that all the "crack" she got from appellant was real crack. White, a long-time crack user who also knew how crack made him feel when he smoked it, testified that appellant's "crack" always made him "high" when he smoked it.

Additionally, the substance at issue was bought and sold in countless transactions conducted over the course of a year. None of the experienced dealers or users who obtained the substance from appellant complained that it was not real crack. Likewise, none of the dealers who subsequently divided and sold the same substance received any such complaints from their customers. The jury could reasonably infer from this evidence that the substance these experienced drug dealers and users repeatedly purchased from appellant was indeed real crack.

Also instructive is the fact that "a high price was paid in cash for the substance." Hill, 8 Va. App. at 63, 379 S.E.2d at 136; see also Uwaeme, 975 F.2d at 1020 (recognizing that

- 17 -

evidence regarding "the high price the defendant had paid" for the substance in question was relevant to show the substance was cocaine). Here, the evidence established that appellant paid approximately $3,500 in cash for each eighth of a kilogram of "crack" he purchased. The evidence also established that appellant then sold the same substance for substantial amounts of money. For example, Traynham paid $700 to $1,000 for each ounce of "crack" he purchased from appellant; Hutcherson paid $250 for each quarter of an ounce and $350 for each half of an ounce; and Singleton paid $900 for each ounce. These purchase prices were consistent with the local street value of crack[5] and, clearly exceeded the value of equivalent amounts of soap or surfboard wax or other substances used to make counterfeit or imitation crack.

It is clear, therefore, that, even without a "certificate of analysis" for the bulk of the substance appellant and his continuing criminal enterprise were dealing, the evidence was sufficient to prove beyond a reasonable doubt that the substance was crack. Over seven grams of chemically analyzed crack were recovered from appellant during the raid on his crack houses. In addition, appellant repeatedly sold crack, over the course of a year, to experienced drug dealers sophisticated enough to ensure they were getting real crack. Moreover, he purchased and sold the crack at crack, not wax or soap, pricing. This evidence amply supported the jury's conclusion that the substance distributed by appellant's enterprise was a mixture that contained "cocaine base."

## B. Quantity of Crack

Appellant argues the evidence was insufficient to prove he distributed "at least five kilograms" of crack, as required by Code § 18.2-248(H2). We disagree.

---

[5] Chief Deputy Richard Pulliam with the Halifax County Sheriff's Office was qualified as an expert in the distribution of crack in Halifax County and testified to the street value of various quantities of crack.

- 18 -

To present the requisite evidence of quantity, the Commonwealth could have presented evidence that appellant, while engaged in the continuing criminal enterprise, distributed five or more kilograms of crack in one year or that he possessed with the intent to distribute five or more kilograms of crack in one year. See Code § 18.2-248(H2).[6] Upon our review of the record, we conclude that the Commonwealth did both.

When viewed in the light most favorable to the Commonwealth, the evidence presented at trial established that appellant purchased an eighth of a kilogram of crack, "two to three times every single week," every week for one year. Thus, appellant purchased, and personally possessed upon its receipt, at least a quarter of a kilogram of crack each week, which amounts to at least 13 kilograms of crack for the year. It is well settled that the possession of drugs in a quantity "greater than the supply ordinarily possessed by a narcotics user for his personal use, is a circumstance which, standing alone, may be sufficient to support a finding of intent to distribute." Hunter v. Commonwealth, 213 Va. 569, 570, 193 S.E.2d 779, 780 (1973). Appellant's possession of 13 kilograms of crack over the course of a year is certainly sufficient to infer he intended to distribute it. See, e.g., Gregory v. Commonwealth, 22 Va. App. 100, 110, 468 S.E.2d 117, 122 (1996) (holding that evidence that the accused possessed 3.7 grams of crack was sufficient to prove he had the intent to distribute it).

In addition, when viewed in the light most favorable to the Commonwealth, the evidence established that appellant actually distributed nearly all of the crack he purchased. Of the 13 kilograms appellant purchased, only about 7 grams were recovered from the raid on the crack houses. Furthermore, appellant's drug distributors testified against him at trial. Traynham's

---

[6] Because appellant himself actually possessed and distributed over five kilograms of crack while engaged in the enterprise, we need not address whether the requisite quantity may also be met either in combination with the enterprise or by the enterprise itself. Compare Code § 18.2-248(H2)(i) (referring to "the enterprise") with Code § 18.2-248(H2)(ii) (referring to "the person").

testimony established that, between December 5, 2003, and December 5, 2004, he distributed over 2,700 grams of crack that he obtained from appellant. Singleton's testimony supported the conclusion that he distributed as much as 1,738 grams of appellant's crack during the same period. Additionally, Hutcherson's testimony was sufficient to establish that he distributed up to 637 grams of appellant's crack; White's testimony permitted the conclusion that he distributed or consumed more than 320 grams of appellant's crack; Duncan's testimony was sufficient to conclude that he distributed up to 540 grams of appellant's crack; and Barksdale's testimony established that he purchased over 28 grams of crack from appellant during the relevant period. Accordingly, the testimony of appellant's drug distributors, alone, was sufficient to satisfy the five-kilogram minimum required by Code § 18.2-248(H2).

Moreover, the Commonwealth presented evidence that, in addition to selling to dealers at the Carrington Street crack house, appellant made twenty to thirty sales per day directly to users at the College Street crack house. The Commonwealth also produced evidence that appellant distributed a considerable amount of crack to Thaxton, Scott, Majors, White, Pookie Torrian, and Wayne Torrian in exchange for their services.

Appellant cites Graves v. Commonwealth, 234 Va. 578, 363 S.E.2d 705 (1988), in support of his argument that the evidence presented in this case was insufficient "to sustain the threshold figure of five kilograms." In Graves, however, the Commonwealth failed to prove the amount of the substance at issue because it relied solely on the police's visual observation of 145 "hand-to-hand exchange[s]" of the substance without presenting any evidence regarding "the quantity [of the substance] involved in the 'transactions.'" Id. at 579-81, 363 S.E.2d at 706-07.

Here, conversely, there was substantial credible evidence presented regarding the amount of the crack purchased and distributed by appellant. Indeed, the jury could have reasonably found that appellant possessed with the intent to distribute as much as 13 kilograms of crack

based on Thaxton's testimony alone. Moreover, the testimony of appellant's distributors permitted the conclusion that appellant distributed well in excess of 5 kilograms of crack. Accordingly, the evidence was sufficient to support the jury's conclusion that appellant engaged in the continuing criminal enterprise to distribute, or possess with the intent to distribute, at least 5 kilograms of a mixture containing cocaine base between December 5, 2003, and December 5, 2004.

C. Continuing Criminal Enterprise

Appellant argues the Commonwealth failed to prove the organization in which he was engaged was a "continuing criminal enterprise," as required by Code § 18.2-248(H2), because the evidence was insufficient to prove he organized, supervised, or managed five or more people. Again, we disagree.

To establish that appellant was engaged in a continuing criminal enterprise, the Commonwealth had to show that appellant's crime was "a part of a continuing series of violations of [Code § 18.2-248] which [were] undertaken by such person in concert with five or more other persons with respect to whom such person occupie[d] a position of organizer, a supervisory position, or any other position of management." Code § 18.2-248(I)(ii).

It is "'within the province of the jury to determine what inferences are to be drawn from proved facts, provided the inferences are reasonably related to those facts.'" Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003) (quoting Inne v. Commonwealth, 217 Va. 360, 366, 228 S.E.2d 563, 567-68 (1976)). Here, the jury inferred that appellant's sizeable, efficient, and profitable crack distributorship required that he organize the activities of at least five people. The evidence supported that conclusion.

The terms "organize, supervise, or manage" are applied in their "ordinary sense as understood by the public or the business community." United States v. Butler, 885 F.2d 195,

200 (4th Cir. 1989) (construing 21 U.S.C. § 848(c)(2)(A)).[7]  These terms are also "used disjunctively in the statute such that it is only necessary that any one of these three relationships be shown to exist between the defendant and a particular underling or associate."  Id.  Moreover, "'[t]he defendant's relationships with the other persons need not have existed at the same time, the five persons involved need not have acted in concert at the same time or with each other, and the same type of relationship need not exist between the defendant and each of the five.'"  Id. (quoting United States v. Apodaca, 843 F.2d 421, 426 (10th Cir. 1988)).

> And while proof of a supervisory or managerial relationship requires a showing of some degree of control by the defendant over the other persons, *such proof is not required to show that a defendant acted as an organizer.*  "An organizer can be defined as a person who puts together a number of people engaged in separate activities and arranges them . . . in one essentially orderly operation or enterprise."

Id. at 201 (emphasis added) (quoting 2 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 58.21 (1977)).  "In essence, the management element is established by demonstrating that the defendant exerted some type of influence over another individual as exemplified by that individual's compliance with the defendant's directions, instructions, or terms."  United States v. Possick, 849 F.2d 332, 336 (8th Cir. 1988).

Here, the evidence was sufficient to show that appellant organized, supervised, or managed Thaxton, Scott, Majors, Singleton, and Duncan.

The evidence established that appellant employed Thaxton as a bodyguard during appellant's crack-selling activities at the College Street crack house.  Thaxton spent six or seven hours a day at that house working with and protecting appellant.  His primary job was to look out

---

[7] Like Code § 18.2-248(I)(ii), 21 U.S.C. § 848(c)(2)(A) provides, in pertinent part, that "a person is engaged in a continuing criminal enterprise if" the person's crime "is a part of a continuing series of violations . . . which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management."

- 22 -

for appellant, "physically and with a little artillery if need be." As appellant's bodyguard, Thaxton was clearly appellant's subordinate and subject to his supervision. See United States v. Chalkias, 971 F.2d 1206, 1214 (6th Cir. 1992) (holding that a person employed by the defendant as a bodyguard during the defendant's drug-related activities was supervised by the defendant); United States v. Pino-Perez, 870 F.2d 1230, 1235 (7th Cir. 1989) (noting that a "bodyguard . . . would presumably be a person supervised by the kingpin").

The evidence also established that Scott allowed appellant to set up a retail operation in his house on College Street. A "defendant's use of another's home to conceal or process drugs has been found to evidence that defendant's dominant or managerial position." Possick, 849 F.2d at 337. Additionally, appellant paid Scott crack for watching the front door at the College Street house when appellant was there and for chauffeuring appellant in connection with his drug-related activities.

The evidence further showed that appellant paid Majors crack for helping Scott watch the front door of the College Street house. Majors and Scott served as lookouts, letting in customers they knew and notifying appellant when someone they did not know came to the door. Clearly, such a service facilitated appellant's drug business and brought both "receptionists" within the ambit of appellant's management and supervision.

The evidence also indicated that, in addition to his retail sales, appellant organized his own network of exclusive dealers. Indeed, appellant specifically recruited both Duncan and Singleton to deal crack exclusively for him, "in a manner analogous to an exclusive franchise dealership." Butler, 885 F.2d at 201. After appellant fronted crack to Singleton in December 2003 to get him back into the business of dealing drugs, Singleton purchased crack only from appellant. Even when appellant did not have the crack Singleton needed, Singleton refused to buy from other wholesalers and waited until appellant could provide it. Additionally, appellant

provided crack to Singleton on credit when necessary. Likewise, appellant gave crack to Duncan in May 2004 to restart his career as a drug dealer. Thereafter, Duncan bought the crack he distributed exclusively from appellant. Evidence that a drug dealer bought exclusively from one supplier proves "more than the existence of a buyer-seller relationship" and indicates "a significant degree of control over how, when, and from whom" the dealer obtained his supply of drugs. Id.; see Possick, 849 F.2d at 336 ("Although the mere 'fronting' of cocaine alone is insufficient to support finding a management relationship, defendants who arrange the acquisition of the drug, its delivery, and set the price and credit terms have been found to fill a 'sufficiently central role' to satisfy the requirements of the management element." (citation omitted) (quoting United States v. Grubbs, 829 F.2d 18, 19-20 (8th Cir. 1987) (per curiam))). Accordingly, the evidence of appellant's exclusive-distributorship arrangements with Singleton and Duncan was sufficient to show that appellant organized, supervised, or managed the two dealers.

Appellant argues that, to establish the requisite management relationship, the Commonwealth had to prove that he "direct[ed] where and when drugs [were to] be sold and the price they [were] to be sold for" and that "the profits from those sales [were] return[ed] to the organizer/supervisor/manager." In making that argument, appellant not only provides no authority to support it, he erroneously assumes an organization cannot be "a loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise." United States v. Johnson, 54 F.3d 1150, 1154 (4th Cir. 1995). In any event, the "ordinary meaning of the word 'organizer' does not carry with it the implication that the organizer is necessarily able to control those whom he or she organizes." United States v. Ray, 731 F.2d 1361, 1367 (9th Cir. 1984).

Because the Commonwealth produced sufficient evidence to support a finding that appellant organized, supervised, or managed Thaxton, Scott, Majors, Singleton, and Duncan, we need not decide whether he also organized, supervised, or managed Pookie or Wayne Torrian (mowing and general maintenance), White (electrical work and dealer), Barksdale (dealer), Hutcherson (dealer), or Traynham (dealer).

## IV.  CRUEL AND UNUSUAL PUNISHMENT

Finally, appellant contends Code § 18.2-248(H2)'s mandatory life sentence constitutes cruel and unusual punishment in violation of the United States and Virginia Constitutions.  We disagree.

"Historically, the Supreme Court of Virginia has deferred to legislative judgment concerning the quantum of punishment for offenses, and held in Hart that [the cruel and unusual provision of the Virginia Constitution] applies only to sentences regarded as cruel and unusual in 1776 when it was first adopted, i.e., sentences involving torture or lingering death."  John L. Costello, Virginia Criminal Law and Procedure § 3.3, at 47 (4th ed. 2008) (citing Hart v. Commonwealth, 131 Va. 726, 741-42, 109 S.E. 582, 586-87 (1921)).  Appellant cites no authority to show how this deference has abated.  Nor does he show that Virginia's Constitution affords more relief than the United States Constitution.  Cf. Bd. for Asbestos and Lead v. Abateco Services, Inc., 33 Va. App. 473, 483, 534 S.E.2d 352, 357 (2000) (applying gross disproportionality test to construe Virginia Constitution, Article I, § 9).

With regard to the Eighth Amendment to the United States Constitution, appellant argues solely that his sentence was cruel and unusual because its mandatory nature did not allow "the sentencing court to consider the factors set forth in" Solem v. Helm, 463 U.S. 277, 292 (1983).  We reject appellant's argument on two grounds.

First and foremost, the United States Supreme Court, in Harmelin v. Michigan, 501 U.S. 957, 994-96 (1991), directly rejected the argument that a sentence is cruel and unusual simply because it is mandatory in nature. Noting that severe mandatory penalties are "not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history," the Court concluded that "[t]here can be no serious contention, then, that a sentence which is not otherwise cruel and unusual becomes so simply because it is 'mandatory.'" Id. at 994-95. In reaching that decision, the Court refused to extend the requirement for "an individualized determination that [the] punishment is appropriate" beyond "the capital context, because of the qualitative difference between death and all other penalties." Id. at 995.

Moreover, even if the factors in Solem were considered, the Court's decision in Harmelin compels the determination that appellant's sentence was not cruel and unusual. While the Supreme Court in Solem "established a three-pronged analysis for reviewing Eighth Amendment proportionality challenges," the Court has since "substantially narrowed that approach and instructed that courts should not go beyond the first prong in most cases." United States v. Gurule, 461 F.3d 1238, 1247 (10th Cir. 2006) (citing Harmelin, 501 U.S. at 1001 (Kennedy, J., concurring)). "Thus, we examine the sentence at issue in relation to the crime only for 'gross disproportionality.'" Id. "Only if we find such gross disparity will we proceed further with the analysis. It is only in the 'rare case' that a 'threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.'" Id. (citation omitted) (quoting Hawkins v. Hargett, 200 F.3d 1279, 1282 (10th Cir. 1999)); see also Lockyer v. Andrade, 538 U.S. 63, 77 (2003) ("The gross disproportionality principle reserves a constitutional violation for only the extraordinary case.").

In Harmelin, for example, the Supreme Court concluded that the imposition of a mandatory life sentence without possibility of parole for the possession of a mere 672 grams of

cocaine did not constitute cruel and unusual punishment. See 501 U.S. at 961-94 (Scalia, J., joined by Rehnquist, C.J.) (rejecting the accused's claim that his sentence was cruel and unusual because it was disproportionate to the crime he committed on the ground that the Eighth Amendment contains no proportionality guarantee); id. at 996-1009 (Kennedy, J., joined by O'Connor and Souter, JJ., concurring in result) (expressing the view that, while the cruel and unusual punishment clause encompasses a narrow proportionality principle that applies to noncapital as well as capital sentences, the accused's sentence was not so disproportionate as to constitute cruel and unusual punishment). In light of the Supreme Court's decision in Harmelin, we cannot say that appellant's similar punishment for a more severe crime is grossly disproportionate to the crime.

We hold, therefore, that appellant's mandatory life sentence does not constitute cruel and unusual punishment and, thus, does not violate the United States and Virginia Constitutions.

## V. CONCLUSION

For these reasons, we affirm the trial court's judgment and appellant's conviction and sentence.

Affirmed.